103 F.3d 1491
 52 Soc.Sec.Rep.Ser. 494, Medicare & Medicaid Guide
P 45,001,
97 Cal. Daily Op. Serv. 231,
97 Daily Journal D.A.R. 362,
97 Daily Journal D.A.R. 463
ORTHOPAEDIC HOSPITAL and the California Association of
Hospitals and Health Systems, Plaintiffs-Appellants,
v.
Kimberly BELSHE, Director of the State Department of Health
Services, State of California, Defendant-Appellee.
 No. 95-55607.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Aug. 9, 1996.
Decided Jan. 9, 1997.
 
 Lloyd A. Bookman and Jonathan P. Neustadter, Hooper, Lundy & Bookman, Los Angeles, California, for plaintiffs-appellants.
 Laurie R. Pearlman, Los Angeles, California; Jonathan R. Davis, Los Angeles, California, for defendant-appellee.
 Appeal from the United States District Court for the Central District of California, Stephen V. Wilson, District Judge, Presiding. D.C. No. CV-94-4764 SVW (JRx).
 Before: FLETCHER and TASHIMA, Circuit Judges, and RESTANI,* Judge.
 FLETCHER, Circuit Judge:
 
 
 1
 Plaintiffs-Appellants Orthopaedic Hospital and the California Association of Hospitals and Health Systems claim that Defendant-Appellee Director of the California Department of Health Services violated section 1396a(a)(30)(A) of the federal Medicaid Act, 42 U.S.C. §§ 1396a-1396v (West 1992 & Supp.1996) by setting reimbursement rates for hospital providers of outpatient services without proper consideration of the effect of hospital costs on the relevant statutory factors: efficiency, economy, quality of care, and access. The district court granted summary judgment in favor of the Director. We reverse and remand with direction.FACTUAL BACKGROUND & PROCEDURAL HISTORY
 
 I. The Medi-Cal Program
 
 2
 Title XIX of the Social Security Act, 42 U.S.C. §§ 1396a-1396v (the "Medicaid Act"), authorizes federal grants to states for medical assistance to low income persons who are aged, blind, disabled, or members of families with dependent children. The program is jointly financed by the federal and state governments and administered by the states. The states, in accordance with federal law, decide eligible beneficiary groups, types and ranges of service, payment levels for services, and administrative and operating procedures. Payment for services is made directly by the states to the individuals or entities that furnish the services. 42 C.F.R. § 430.0. To receive matching federal financial participation for such services, states must agree to comply with the applicable federal Medicaid law.
 
 
 3
 Among the health care services that must be provided by states participating in Medicaid are the medical services at issue in this case--hospital outpatient services. 42 U.S.C. §§ 1396a(a)(10)(A), 1396d(a)(2)(A). Hospital outpatient services are preventive, diagnostic, therapeutic, rehabilitative, or palliative services that are furnished to outpatients by an institution that is licensed as a hospital. 42 C.F.R. § 440.20(a).
 
 
 4
 Many procedures that once required a lengthy inpatient stay, can now be provided on an outpatient basis. This factor, and the desire to cut costs associated with inpatient stays, has led to a general shift towards outpatient care. This factor has also lead to an increase in the complexity of services provided on an outpatient basis.
 
 
 5
 Some of the services provided by hospital outpatient departments could be provided more economically by non-hospital providers such as freestanding clinics or doctors' offices because those providers have lower fixed costs than do hospitals. However, hospital outpatient departments are more widely available to Medi-Cal beneficiaries. Hospitals that accept any Medicare payments and operate emergency departments are required by law to examine and (if an emergency medical condition exists) to treat any patient who presents him or herself, regardless of the patient's ability to pay. 42 U.S.C. § 1395dd. In contrast, other outpatient service providers are free to deny care to Medi-Cal recipients and others who are unable to pay for care. With no incentive to use the most economical provider, Medi-Cal beneficiaries frequently choose the more accessible and convenient hospital outpatient departments over less costly facilities, some of which may be entirely unavailable or less available to them.
 
 
 6
 The Defendant-Appellee's agency, the Department of Health Services of the State of California, is the state agency responsible for the administration of California's version of Medicaid, the Medi-Cal program. Medi-Cal has a prospective reimbursement system that sets reimbursement rates for specific services, regardless of where those services are performed (e.g., in hospitals, doctors' offices, or freestanding outpatient clinics). Cal.Code Regs. tit. 22, §§ 51501-51557.
 
 
 7
 Hospital outpatient departments receive an additional reimbursement for room charges, not received by non-hospital providers. Cal.Code Regs. tit. 22, § 51509(g). However, this additional payment is offset by a 20% reduction in the reimbursement rate for physician services furnished in hospital outpatient departments. Cal.Code Regs. tit. 22, § 51503(i). All other outpatient reimbursement rates are the same as those applicable to non-hospital providers. Cal Code Regs. tit. 22, § 51509.
 
 
 8
 Hospitals which serve a disproportionate share of Medi-Cal beneficiaries[1] and small and rural hospitals are eligible for additional reimbursement from Medi-Cal. However, there are relatively few funds available for these additional payments: $14 million annually. 3 A.R. at 242. In 1991, the total payments for outpatient services were approximately $355 million. 3 A.R. at 436.
 
 
 9
 The Medicaid Act requires a participating state to develop a state plan which describes the policy and methods to be used to set payment rates for each type of service included in the program. 42 C.F.R. § 447.201(b). California's state plan requires the Department to develop an evidentiary base or rate study, have a public hearing on the proposed rates, determine final rates based on the evidentiary base including public input, and adopt final rates through regulations. However, the state plan also allows the legislature to adjust the rates so long as the requirements of 42 C.F.R. Part 447 are met. Before any rate changes are made, the Department must consult with representatives of concerned provider groups.
 
 
 10
 In 1982 the California legislature reduced the outpatient reimbursement rates by 10%, and the rates for laboratory services by 25%. In 1984 and 1985 the Department made across the board rate increases resulting in a net increase of 2% over the rates in effect prior to the 1982 reduction. Since 1985 the Department has modified the rates for certain services and has provided additional reimbursement for disproportionate share and small and rural hospitals.
 
 II. Prior Litigation
 
 11
 The Hospitals challenge the adequacy of certain of the reimbursement rates the State of California has set for hospitals that provide outpatient services to Medi-Cal beneficiaries. The reimbursement rates currently in effect were set by the Director upon the district court's remand in Orthopaedic Hosp. and the Cal. Ass'n of Hosp. and Health Sys. v. Kenneth Kizer, M.D., Director of the Cal. Dep't of Health Serv., No. CV 90-4209 SVW (JRx), 1992 WL 345652 (C.D.Cal.) ("Orthopaedic I"). The district court reviewed seven specific rate adjustments and found that the Director had acted arbitrarily and capriciously in setting six out of seven of the disputed rates.
 
 
 12
 It found that (1) efficiency, economy, and quality of care are "relevant factors" under 42 U.S.C. § 1396a(a)(30)(A) and must be considered by the Department when making any rate adjustments; (2) there must be a "rational connection" between the relevant factors and the rates set; and (3) the Department did not consider the relevant factors in six of the seven rate adjustments at issue.
 
 
 13
 The district court revised its judgment twice. In its Order Amending the Revised Judgment, it clarified that "[t]he Court has not made any ruling on the validity of the rates themselves and cannot comment on whether the defendant will be able to set similar or identical rates once it conducts a proper inquiry and considers 'efficiency, economy and ... quality of care.' " In its Second Revised Judgment, the district court ordered that the six improperly promulgated rates would remain in effect until the Department set new rates upon proper consideration of the relevant factors. However, to discourage the Department from delaying reconsideration of its rates, the district court ordered that the new rates were to be applied retroactively from the date of its original summary judgment order.
 
 III. The Remand
 
 14
 Upon remand, the Department conducted a rate study as required by the decision in Orthopaedic I. In September 1993, the Department published the results of that study entitled "Consideration of Efficiency, Economy, and Quality of Care and Access with Respect to Changes in Medi-Cal Reimbursement for Hospital Outpatient Services." The Department also issued a Statement of Administrative Decision in which it stated that the Department "does not feel that it is necessary to change Medi-Cal reimbursement for hospital outpatient services from current levels. Having considered efficiency, economy, quality of care and access, the Department has therefore decided to readopt the [existing] reimbursement levels...."
 
 
 15
 In December 1993 the Department held a public hearing regarding the outpatient rates. The California Association of Public Hospitals and the Plaintiff California Association of Hospitals and Health Systems submitted public comments and voluminous materials. The Department summarized the public input into an addendum to its rate study.
 
 
 16
 After the close of public comment and in response to criticism that Medi-Cal outpatient reimbursement rates failed to cover hospitals' costs adequately, the Department commissioned a study by Peterson Consulting. The Peterson study compared total Medi-Cal reimbursement (including inpatient, outpatient, disproportionate share and small and rural hospital reimbursement) to costs for participating California hospitals. The Peterson study concluded that total Medi-Cal reimbursement for inpatient and outpatient hospital services covers at least 100% of the costs incurred by at least 34% of participating hospitals, and 58% of hospitals have 75% of costs covered.
 
 
 17
 In contrast, an analysis performed for the Hospitals by Dr. Henry Zaretsky concluded that only 0.8% of hospitals were reimbursed 100% of their costs in providing outpatient services, and that 73% of hospitals were reimbursed less than 50% of their costs. Dr. Zaretsky's analysis specifically compared Medi-Cal outpatient reimbursement to costs.
 
 
 18
 In April 1994 the Department issued its final administrative decision readopting the hospital outpatient reimbursement rates without change.
 
 IV. District Court Review of Readopted Rates
 
 19
 The Hospitals alleging that the Department's readoption of its original rates did not satisfy 42 U.S.C. § 1396a(a)(30)(A) or the mandate of the court in Orthopaedic I, returned to court filing two actions, Case Nos. 94-4764 and 94-4825 ("Orthopaedic II/III "). They were consolidated by the district court.
 
 
 20
 The district court characterized the chief issue in Orthopaedic II/III to be whether, as part of the State's obligation to set payment rates consistent with efficiency, economy, quality of care and access, "the State must provide higher payments to hospitals for provision of outpatient services because hospitals incur higher costs than other types of providers." The district court concluded that the Department is not statutorily required to consider hospitals' costs when setting reimbursement rates for hospital outpatient services under § 1396a(a)(30)(A).
 
 
 21
 The district court denied the Hospitals' motion for summary judgment and sua sponte awarded summary judgment to the Director. The Hospitals timely appeal.
 
 JURISDICTION
 
 22
 The Hospitals brought their action under 42 U.S.C. § 1983 claiming injury from the Director's violation of 42 U.S.C. § 1396a(a)(30)(A). The district court had jurisdiction under 28 U.S.C. § 1331.
 
 
 23
 We have jurisdiction under 28 U.S.C. § 1291 over the Hospitals' appeal from the district court's final judgment granting summary judgment to the Director.
 
 STANDARD OF REVIEW
 
 24
 A grant of summary judgment is reviewed de novo. Warren v. City of Carlsbad, 58 F.3d 439, 441 (9th Cir.1995), cert. denied, 516 U.S. 1171, 116 S.Ct. 1261, 134 L.Ed.2d 209 (1996).
 
 
 25
 We review de novo a state agency's interpretation of a federal statute. AMISUB (PSL), Inc. v. Colorado Dep't of Social Serv., 879 F.2d 789, 796 (10th Cir.1989) (reviewing state Medicaid Plan, court subjected state agency's determination of procedural and substantive compliance with federal law to de novo review), cert. denied, 496 U.S. 935, 110 S.Ct. 3212, 110 L.Ed.2d 660 (1990); Turner v. Perales, 869 F.2d 140, 141 (2d Cir.1989) (reviewing state department of social services' interpretation of federal housing assistance law de novo); Lewis v. Hegstrom, 767 F.2d 1371, 1376 (9th Cir.1985) (reviewing construction of Medicaid Act de novo, without deference to state agency's construction).
 
 
 26
 A state agency's interpretation of federal statutes is not entitled to the deference afforded a federal agency's interpretation of its own statutes under Chevron U.S.A. Inc. v. Natural Resources Defense Council Inc., 467 U.S. 837, 843, 104 S.Ct. 2778, 2781-82, 81 L.Ed.2d 694 (1984). "Chevron's policy underpinnings emphasize the expertise and familiarity of the federal agency with the subject matter of its mandate and the need for coherent and uniform construction of federal law nationwide. Those considerations are not apt [to a state agency]." Turner, 869 F.2d at 141. What concerns us is whether the state law and regulations are consistent with federal law. Neither the district court nor we defer to the state to answer that question.
 
 DISCUSSION
 
 27
 This appeal turns upon the proper interpretation of 42 U.S.C. § 1396a(a)(30)(A) which states that under the Medicaid Act, a state plan for medical assistance must:
 
 
 28
 provide such methods and procedures relating to the utilization of, and the payment for, care and services available under the plan ... as may be necessary to safeguard against unnecessary utilization of such care and services and to assure that payments are consistent with efficiency, economy, and quality of care and are sufficient to enlist enough providers so that care and services are available under the plan at least to the extent that such care and services are available to the general population in the geographic area.
 
 
 29
 42 U.S.C. § 1396a(a)(30)(A).
 
 
 30
 Whether the statute requires the Department to consider the costs hospitals incur in delivering services when setting specific payment rates under § 1396a(a)(30)(A) is the issue. We conclude that the Director must set hospital outpatient reimbursement rates that bear a reasonable relationship to efficient and economical hospitals' costs of providing quality services, unless the Department shows some justification for rates that substantially deviate from such costs. To do this, the Department must rely on responsible cost studies, its own or others', that provide reliable data as a basis for its rate setting.
 
 
 31
 The statute provides that payments for services must be consistent with efficiency, economy, and quality of care, and that those payments must be sufficient to enlist enough providers to provide access to Medicaid recipients. The Department cannot know that it is setting rates that are consistent with efficiency, economy, quality of care and access without considering the costs of providing such services. It stands to reason that the payments for hospital outpatient services must bear a reasonable relationship to the costs of providing quality care incurred by efficiently and economically operated hospitals.
 
 
 32
 The Department argues that the payments must be sufficient (i.e. high enough) to ensure access, but they only need to be consistent with efficiency, economy, and quality of care.
 
 
 33
 It is true that "consistent," not "sufficient," modifies the terms, efficiency, economy, and quality of care. But even "consistency" would appear to require that the Department consider the costs of providing the services for which it is reimbursing. "Consistent" means in agreement with, compatible, or conforming to the same principles or course of action, while "sufficient" means adequate. Webster's II New Riverside University Dictionary, c. 1984. These are not widely different standards. For payments to be consistent with efficiency, economy and quality of care, they must approximate the cost of quality care provided efficiently and economically. The Department cannot set rates consistent with efficiency and economy in the health care system without considering the costs to the hospitals that provide most of the services. Judgments can be made as to the efficiency of the providers, the economies they practice and the quality of the services they deliver, but costs are an integral part of the consideration.
 
 
 34
 The district court found that it would be inefficient and uneconomical to set rates that compensated hospitals for their costs since hospitals are the most expensive providers of outpatient services. The district court reasoned that states should be able to provide incentives for one type of care over another. We agree, but undercompensating hospitals gives no incentives to Medi-Cal beneficiaries to use more economical providers unless it results in a cessation of the delivery of emergency services by hospitals. Non-hospital providers are not nearly as available to Medi-Cal beneficiaries as are hospitals. And no lack of economic incentive excuses a hospital that serves Medicare patients from its legal obligation to provide emergency care to all comers if it operates an emergency department. Until the Department provides incentives to non-hospital providers to furnish more services to Medi-Cal beneficiaries, and requires Medi-Cal beneficiaries to utilize non-hospital providers whenever possible, undercompensating hospital outpatient departments does nothing to shift users to more efficient and economical delivery of care outside the hospital setting.
 
 
 35
 Since the payments themselves must also be consistent with quality of care, the Department must consider the costs of providing quality care. The Department argues that the payments do not independently have to support quality care because quality is assured by other regulations. Essentially, the Department's position is that it doesn't have to pay the costs of quality care because hospitals are contractually obligated to provide quality care once they agree to take Medicaid patients, and because hospitals' licensing requirements require them to provide quality care. We disagree. The Department, itself, must satisfy the requirement that the payments themselves be consistent with quality care.
 
 
 36
 Section 1396a(a)(30)(A) originally required that Medicaid payments not be "in excess of reasonable charges consistent with efficiency, economy, and quality of care ..." The Hospitals interpret this original language to mean that "reasonable charges" were the payment ceiling, and "efficiency, economy, and quality of care" marked the payment floor. The Department asserts that the original language actually set a two-tiered payment ceiling, establishing that payments could be no higher than reasonable charges, and also no higher than what would be consistent with efficiency, economy, and quality of care. Both interpretations are off the mark.
 
 
 37
 The "in excess of reasonable charges" language was removed in 1981 by § 2174(a) of Public Law 97-35, but the "consistent with efficiency, economy, and quality of care" language remained. Apparently, the reasonable charges standard had been burdensome to administer because it was tied to reasonable charges under Medicare. The Budget Committee Report on the amendment that repealed the "reasonable charges" language expressed that the purpose of the amendment was:
 
 
 38
 to remove the administrative burdens this requirement of current law imposes on the States and to provide States with the flexibility to create incentives to improve the availability and utilization of physician services under medicaid.
 
 
 39
 The Committee believes the removal of the ceiling on physician payments based on medicare will not result in an increase in expenditures for physician services under medicaid. The States all face clear cost pressures in their medical programs. Therefore, the Committee expects this provision will be used by the States to improve the administration of their medicaid programs and to try innovative approaches to physician payment rather than merely to raise physician fees above medicare levels.
 
 
 40
 H.R.Rep. No. 97-158, vol. II, at 312 (1981).
 
 
 41
 By removing the reasonable charges limitation, Congress wanted to simplify the administrative burden, and allow states more flexibility in devising ways to make services available, while at the same time containing costs. But states still must comply with the efficiency, economy, quality of care, and access standards. It appears that Congress intended payments to be flexible within a range; payments should be no higher than what is required to provide efficient and economical care, but still high enough to provide for quality care and to ensure access to services.
 
 
 42
 The Budget Committee also noted that states should now "be free to design their reimbursement systems to provide incentives for provision of primary care over specialty care or to reduce the urban-rural differential in payment levels." Id. at 313. The Department argues that if reimbursement levels were related to costs, it would be impossible to achieve these goals. But undercompensating hospitals cannot achieve these goals. Incentives to non-hospital providers to treat Medicaid outpatients and encouragement of Medicaid patients to utilize alternate services is required. The Department argued, as an example, that their 1989 reduction in reimbursement for cesarean sections, that was intended to discourage unnecessary cesarean sections, would not have been allowed if the Department had to reimburse at a level that related to the cost of services. But the Department forgets that it is still free to discourage unnecessary procedures through utilization controls without violating § 1396a(a)(30)(A). If a reimbursement rate provides an incentive to use an inappropriate service, then it is not consistent with efficiency, economy, and quality of care.
 
 
 43
 The equal access to care provision of § 1396a(a)(30)(A) was added by amendment in 1989, although it had been implemented prior to 1989 through federal regulation. 42 C.F.R. § 447.204. In its Rate Study, the Department admitted that the access requirement serves to mandate a minimum payment standard. 1 A.R. at 13. However, the Department contends that in the absence of a de facto access problem, any payment rate would meet this minimum standard.
 
 
 44
 De facto access, produced by factors totally unrelated to reimbursement levels, does not satisfy the requirement of § 1396a(a)(30)(A) that payments must be sufficient to enlist enough providers. Currently, access appears to be driven to a degree by factors independent of costs of the services. Hospitals that accept any Medicare payments and that operate emergency departments are legally required to treat emergency patients regardless of their ability to pay. 42 U.S.C. 1395dd. Emergency room services represent more than 50 percent of all Medi-Cal payments for hospital outpatient services. 2 A.R. at 60-69, 3 A.R. at 166. Hospitals have a legal obligation to provide those services regardless of the level of Medi-Cal reimbursement rates. Some hospitals also serve patients with non-emergency conditions regardless of their ability to pay because those hospitals have a mission to serve everyone. A hospital's only option to avoid accepting insufficient Medicaid reimbursements is to close their emergency departments or stop accepting any federal funds through Medicare.
 
 
 45
 In this case there has been no assertion of a provider participation problem. However, as discussed above, any hospital that accepts any Medicare payments and operates an emergency department, cannot opt out of providing emergency care for Medicaid patients, regardless of the reimbursement rates. 42 U.S.C. § 1395dd. Since most hospitals accept Medicare patients and operate emergency departments, and many hospitals have public service missions to provide care regardless of patients' ability to pay, currently provider participation by such institutions is assured.
 
 
 46
 The compelling "other" reasons for provider participation by such institutions has allowed the Department to ignore the relationship of reimbursement levels to provider costs when determining whether payments are sufficient to ensure access to quality services. The result is that the Department has not sought to shift services to entities that could provide them more economically and efficiently but rather to force hospitals to provide the service and to shift the cost to other patients. This technique of underpayment for services received is not economic, efficient or attentive to adequate access. It is neither economical nor efficient for the system as a whole. The Department need not follow a rigid formula of payments equal to an efficiently and economically operated hospital's costs regardless of other factors such as incentives and utilization controls. But the Department must undertake to determine what it costs an efficient hospital economically to provide quality care. Absent some justification from the Department, the reimbursement rates must ultimately bear a reasonable relationship to those costs.
 
 
 47
 The Department argues that such an interpretation of § 1396a(a)(30)(A) effectively applies the rate-setting statute for inpatient services, § 1396a(a)(13)(A) (the "Boren Amendment"), to outpatient services. The Boren Amendment requires states to set reimbursement rates based on the costs that must be incurred by efficiently and economically operated hospitals.[2] The Department argues that the lack of such explicit language in § 1396a(a)(30)(A) indicates that Congress did not intend provider costs to be a factor in outpatient rates. The Department further argues that requiring the Department to consider costs when setting outpatient reimbursement rates would render the Boren Amendment superfluous.
 
 
 48
 We disagree. The Boren Amendment requires the Department to make assurances to the Secretary of Health and Human Services that rates are reasonable and adequate to meet the hospitals' costs, and requires periodic cost reports from hospitals subject to audit by the Department. These requirements are not part of § 1396a(a)(30)(A). The requirements of § 1396a(a)(30)(A) are more flexible than the Boren Amendment, but not so flexible as to allow the Department to ignore the costs of providing services. For payment rates to be consistent with efficiency, economy, quality of care and access, they must bear a reasonable relationship to provider costs, unless there is some justification for rates that do not substantially reimburse providers their costs.[3]
 
 
 49
 I. Department's Readoption of Existing Reimbursement Rates
 
 
 50
 Because the Department must consider hospitals' costs based on reliable information when setting reimbursement rates, we conclude that the Department's readoption of the existing Medi-Cal rates violated § 1396a(a)(30)(A).
 
 
 51
 Since the Director maintains that the payments themselves do not have to bear any relationship to hospitals' costs, she does not even argue that the Department considered them. The department's initial reevaluation of its rates consisted of:
 
 
 52
 (1) a contrast of program expenses to the statutory Medi-Care ceiling; (2) Departmental and federal utilization controls that assure that the payments are consistent with sound medical policy regarding medical necessity and quality of care; and (3) independent analyses of substitute providers' efficiency, costs and charges and of various other components of the reimbursement system.
 
 
 53
 Appellee's Brief at 29.
 
 
 54
 The analysis of substitute providers involved an inquiry into whether non-hospital providers could deliver outpatient services more efficiently than hospital providers. Upon determining that non-hospital providers were more efficient, the Department concluded that "absent an access problem, 'it is not appropriate to pay additional reimbursement to a provider type that (1) is not as cost efficient as other providers in providing the services, or (2) charges the program more than other providers do for the same services.' " Appellee's Brief at 32.
 
 
 55
 The Department's analysis fails to consider that the majority of outpatient services are in fact provided in hospitals, and that the majority of hospital outpatient services are in the emergency room. The Department contends that it shouldn't have to compensate hospitals for their costs because emergency rooms are overused and are often used for non-urgent conditions. True as this may be, emergency rooms are overused precisely because they are the only accessible providers of primary care for many people, particularly Medicaid recipients. The Department cannot ensure access by relying on regulations requiring hospitals to treat patients in the emergency room, and then refuse to pay the cost of such treatment because theoretically it could have been provided more efficiently elsewhere. Nowhere does it appear that the Department inquired whether Medi-Cal beneficiaries had adequate access to outpatient services in non-hospital settings.
 
 
 56
 In concluding that the existing payment rates were consistent with quality of care, the Department relied solely upon the fact that hospitals are forced to provide quality care because of other legal and contractual obligations which have nothing to do with the payment rates. Clearly this conclusion was not based on any consideration of the costs of providing quality care.
 
 
 57
 The Department's initial Rate Study did not include any analysis of the relationship of reimbursement rates to provider costs. Instead, the Rate Study devoted its analysis to supporting the conclusion that "the failure of existing rates to fully compensate providers based upon a cost or charge criterion is not relevant to whether the rates are consistent with efficiency or economy."
 
 
 58
 After publishing its Rate Study and hearing public comments, the Department did commission a study by Peterson Consulting to evaluate the relationship of reimbursement rates to provider costs. The Peterson study came to conclusions that were markedly different from those in Dr. Zaretsky's analysis for the Hospitals. The main difference in methodology between the two studies is that the Peterson study looked at total Medi-Cal payments to hospitals including inpatient, outpatient and disproportionate share payments, while the Zaretsky analysis looked specifically at outpatient payments.
 
 
 59
 Both the Hospitals and the Department have numerous quarrels with the validity of each other's data and methodology. The Hospitals also claim that the Peterson study is not legitimately included in the Administrative Record since it was added after the period for public comment had closed. We need not parse these arguments. Regardless of the merits of the Peterson study, the Department did not base its readoption of existing rates on the conclusion that they adequately reimburse provider costs. Since the Department did not consider hospitals' costs when reevaluating its rates, it has not appropriately applied § 1396a(a)(30)(A). Without an appropriate consideration of the relevant factors, the Department cannot possibly conclude that there is a rational relationship of those factors to the rates set. Therefore, the Department's actions in readopting the original reimbursement rates were arbitrary and capricious, and contrary to law.
 
 CONCLUSION
 
 60
 The proper interpretation of § 1396a(a)(30)(A)'s requirement that payments for services must be consistent with efficiency, economy, and quality of care, and sufficient to ensure access, requires the Department to consider the costs of providing hospital outpatient services. While the Department's hospital outpatient rates should reflect consideration of many factors, they also should bear a reasonable relationship to an efficient and economical hospital's costs in providing quality care. Since the Department did not adequately consider hospitals' costs when readopting its rates, the Department's actions were arbitrary and capricious and contrary to law.
 
 
 61
 Upon remand, the Department should undertake responsible cost studies that will provide reliable data as to the hospitals' costs in providing outpatient services to the end that it determine the cost to an efficient hospital economically providing quality care. The state must then set rates that have some reasonable relation to such costs, the state bearing the burden of justifying any rate that substantially deviates from such determined costs.
 
 
 62
 REVERSED and REMANDED.
 
 
 
 *
 Honorable Jane A. Restani, United States Court of International Trade, sitting by designation
 
 
 [1]
 Hospitals that serve a disproportionately large share of Medi-Cal outpatients as compared to other hospitals receive additional funds. This is calculated annually based on a prescribed formula. See Cal. Welfare and Institutions Code § 14105.98 (West.Supp.1996)
 
 
 [2]
 The Boren Amendment requires the Department to set inpatient reimbursement rates that "the State finds, and makes assurances satisfactory to the Secretary, are reasonable and adequate to meet the costs which must be incurred by efficiently and economically operated facilities in order to provide care and services ... and to assure that individuals eligible for medical assistance have reasonable access ... to inpatient hospital services of adequate quality; and such State makes further assurances, satisfactory to the Secretary, for the filing of uniform cost reports by each hospital ... and periodic audits by the State of such reports." 42 U.S.C. § 1396a(a)(13)(A)
 
 
 [3]
 It is not justifiable for the Department to reimburse providers substantially less than their costs for purely budgetary reasons. See Beno v. Shalala, 30 F.3d 1057, 1069 (9th Cir.1994) (rejecting budget cutting as a legitimate justification for the approval of a waiver from federal AFDC requirements); Arkansas Medical Society, Inc. v. Reynolds, 6 F.3d 519, 531 (rejecting "exclusively budgetary" justification for rate cuts to Medicaid providers); AMISUB v. Colo. Dep't of Social Serv., 879 F.2d 789, 800-01 (10th Cir.1989) (rejecting state Medicaid plan that resulted in 46% reduction in provider reimbursement as being based solely on budgetary constraints: "While budgetary constraints may be a factor to be considered by a state when amending a current plan ... budgetary constraints alone can never be sufficient."), cert. denied, 496 U.S. 935, 110 S.Ct. 3212, 110 L.Ed.2d 660 (1990)