CALIFORNIA PHARMACISTS
ASSOCIATION, et al.,
Plaintiff(s),

v.

**David Maxwell JOLLY, Defendant.**

**Case No. CV 09–722 CAS (MANx).**

United States District Court,
C.D. California,
Western Division.

March 9, 2009.

---

Byron J. Gross, Craig J. Cannizzo, Felicia Y. Sze, Jordan Brian Keville, Lloyd A. Bookman, Michael A. Dubin, Hooper Lundy & Bookman Inc., Los Angeles, CA, for Plaintiffs.

Gregory Martin Cribbs, Randall R. Murphy, CAAG, Office of Attorney General of California, Los Angeles, CA, Shannon M. Chambers, CAAG, Office of the Attorney General, Sacramento, CA, for Defendant.

## ORDER GRANTING PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION AS TO ADULT DAY HEALTH CENTERS

CHRISTINA A. SNYDER, District Judge.

## I. INTRODUCTION AND BACKGROUND

On September 16, 2008, the California Legislature passed Assembly Bill 1183 ("AB 1183"), which was subsequently signed by the Governor and filed with the Secretary of State on September 30, 2008. AB 1183, *inter alia*, amends Cal. Welf. & Inst.Code. § 14105.191 and § 14166.245, mandating that, for dates of service on or after March 1, 2009, Medi–Cal reimbursement payments to some fee-for-service providers are reduced by one percent, five percent, or ten percent, depending on provider type. Particularly relevant to the instant action, AB 1183 mandates a five percent rate reduction for Medi–Cal fee-for-service benefits paid to pharmacies and Adult Day Health Centers ("ADHCs").

These reductions mandated in AB 1183 replace the ten percent rate reduction put into place by Assembly Bill X35 ("AB 5"), which terminates on February 28, 2009. *See* Cal. Welf. & Inst.Code § 14105.19(b)(1). AB 5 was passed by the California Legislature on February 16, 2008. On August 18, 2008, the ten percent rate reduction mandated by AB 5 was partially enjoined by this Court in a related action, *Independent Living Center of Southern California, Inc. v. Sandra Shewry*, CV–08–3315–CAS. In issuing the preliminary injunction, this Court found that petitioners had, *inter alia*, demonstrated a strong likelihood of success in showing that AB 5 was preempted by § 30(A) of the Medicaid Act (referred to herein as "§ 30(A)"). The Court's August 18, 2008 order is currently being appealed to the Court of Appeals for the Ninth Circuit.[1]

On January 29, 2009, plaintiffs California Pharmacists Association; California Medical Association; California Dental Association; California Hospital Association; California Association for Adult Day Services; Marin Apothecary, Inc.; South Sacramento Pharmacy; Farmacia Remedios, Inc.; Acacia Adult Day Services; Sharp Memorial Hospital; Grossmont Hospital Corporation; Sharp Chula Vista Medical Center; Sharp Coronado Hospital and Healthcare

---

**1.** The Court's August 18, 2008 order was issued on remand from the Ninth Circuit, after plaintiffs appealed this Court's original June 25, 2008 ruling on their preliminary injunction motion. The Court's June 25, 2008 order found that plaintiffs in Independent Living lacked any federal rights under § 30(A), and therefore had denied petitioners' motion for preliminary injunction. On appeal, the Ninth Circuit held that plaintiffs could bring suit under the Supremacy Clause to enjoin AB 5 as preempted under the Medicaid Act, and remanded to this Court. *See Independent Living Center of Southern California et al. v. Sandra Shewry et al.*, 543 F.3d 1050 (9th Cir. 2008).

Center; Fey Garcia; and Charles Gallagher filed the instant action against David Maxwell–Jolly, Director of the Department of Health Care Services of the State of California. Plaintiffs' complaint challenges the AB 1183 Medi–Cal reimbursement rate reductions to various providers.

On February 11, 2009, plaintiffs filed the instant motion for a preliminary injunction. Specifically, plaintiffs seek an order for a preliminary injunction restraining and enjoining the defendant from reducing Medi–Cal fee-for-service rates to pharmacies and adult day health care centers ("ADHCs") pursuant to AB 1183.

On February 27, 2009, this Court issued an injunction in the related case *Managed Pharmacy Care, et al. v. David Maxwell–Jolly,* CV09–382–CAS, ordering defendant "Director, his agents, servants, employees, attorneys, successors, and all those working in concert with him to refrain from enforcing Cal. Welf. & Inst.Code § 14105.191(b)(3), as modified by AB 1183 beginning on March 1, 2009, by refraining from reducing by five percent payments to pharmacies for prescription drugs (including prescription drugs and traditional over-the-counter drugs provided by prescription) provided under the Medi–Cal fee-for-service program." Therefore, the Court considers plaintiffs' request for an injunction as to pharmacies to be moot, and considers herein only their request for injunction as to ADHCs.[2]

On February 26, 2009, defendant filed an opposition to plaintiff's motion for preliminary injunction. A reply was filed on March 4, 2009. After carefully considering the arguments set forth by the parties, the Court finds and concludes as follows.

## II. LEGAL STANDARD

■■■ A preliminary injunction is appropriate when the moving party shows either (1) a combination of probable success on the merits and the possibility of irreparable harm, or (2) the existence of serious questions going to the merits and that the balance of hardships tips sharply in the moving party's favor. *See Rodeo Collection, Ltd. v. West Seventh,* 812 F.2d 1215, 1217 (9th Cir.1987). These are not two distinct tests, but rather "the opposite ends of a single 'continuum in which the required showing of harm varies inversely with the required showing of meritoriousness.'" *Id.* A "serious question" is one on which the movant "has a fair chance of success on the merits." *Sierra On–Line, Inc. v. Phoenix Software, Inc.,* 739 F.2d 1415, 1421 (9th Cir.1984).

## III. DISCUSSION

### A. ELEVENTH AMENDMENT AND PRUDENTIAL STANDING

■■■ Before addressing the merits of plaintiffs' argument for preliminary injunction, the Court must first address two arguments raised by defendant: (1) that

---

**2.** In *Managed Pharmacy Care, et al. v. David Maxwell–Jolly,* CV09–382–CAS, plaintiffs' arguments regarding irreparable harm focused on brand and generic drugs dispensed by pharmacies. The Court therefore found that plaintiffs had not shown irreparable harm as to the effect of the five percent rate reduction on other pharmacy products, and limited the scope of the injunction to drug products dispensed by pharmacies.

In their reply, plaintiffs request that the Court rule on the merits of their motion for

injunction as to pharmacies, arguing that the scope of the injunction requested in the instant action is broader than that granted in *Managed Pharmacy Care,* CV09–382–CAS. However, plaintiffs offer no basis for extending the scope of the injunction as to pharmacies issued in *Managed Pharmacy Care,* and, after examining the evidence submitted by plaintiffs in the instant action, the Court finds no basis for such an extension.

plaintiffs' suit is barred by the Eleventh Amendment and (2) that plaintiffs lack standing. The Court finds that neither of these arguments is persuasive.

The essence of defendant's Eleventh Amendment argument is that plaintiffs' suit effectively amounts to a request for money damages to be paid out of the state treasury, in violation of the Eleventh Amendment. *See* Opp'n at 25, n. 22 ("Plaintiffs seek to recover money against the State for funds above the 5% payment reduction"), citing *Edelman v. Jordan,* 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974) ("Thus the rule has evolved that a suit by private parties seeking to impose a liability which must be paid from public funds in the state treasury is barred by the Eleventh Amendment"). However, the Court disagrees with defendant's characterization of plaintiffs' claim. Plaintiffs complaint does not seek money damages, but instead seeks only prospective injunctive relief—namely, an injunction preventing defendant from enforcing a state law that, defendants argue, is preempted by the Medicaid Act. Such prospective injunctive relief against a state official is permissible under *Ex Parte Young,* 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908), even where such an injunction will have an effect on the state treasury. *See, e.g., Milliken v. Bradley,* 433 U.S. 267, 97 S.Ct. 2749, 53 L.Ed.2d 745 (1977) (federal courts permitted "to enjoin state officials to conform their conduct to requirements of federal law, notwithstanding a direct and substantial impact on the state treasury").

■ Defendant also argues that plaintiffs lack prudential standing, because they are health care providers who have no "rights" under the federal law they seek to enforce. Opp'n at 25, n. 22. The Court disagrees. In its September 17, 2008 order in the related action *Independent Living,* 543 F.3d at 1065, the Ninth Circuit determined that petitioners in that action had standing:

> Petitioners include independent pharmacies and health care providers participating in the State's Medi–Cal program that, according to their complaint, will be directly injured, by loss of gross income, when the ten-percent rate reduction takes effect. The Supreme Court repeatedly has recognized that such [direct economic] injuries establish the threshold requirements of Article III standing. Moreover, this injury is directly traceable to the Director's implementation of AB 5, and would certainly be redressed by a favorable decision of this court enjoining the ten-percent rate reduction.

As in *Independent Living,* plaintiffs in the instant action include ADHC providers, who, plaintiffs allege, would be directly injured by the five percent Medi–Cal reimbursement rate reduction.

Furthermore, the Ninth Circuit in *Independent Living* noted that

> petitioners also include several individual Medi–Cal beneficiaries, who will be injured or put at risk of injury by implementation of the 10% provider payments cuts because those cuts will reduce quality services, and access to quality services. This injury, like the injury to medical providers discussed above, is the direct result of the Director's implementation of AB 5, and would certainly be remedied by a decision granting injunctive relief. Such an injury to those individuals most directly affected by the administration of [a state welfare] program is sufficient to allow petitioners to seek injunctive relief in federal court.

543 F.3d 1050 (9th Cir.2008). Because plaintiffs in this case also include Medi–Cal beneficiaries who may be harmed by AB 1183 rate reductions, the Court finds de-

fendant's argument that plaintiffs lack standing to be without merit.

## B. LIKELIHOOD OF SUCCESS ON THE MERITS

▮▮▮ Pursuant to the holding of the Ninth Circuit in the related action *Independent Living*, 543 F.3d at 1065, the Court finds, as an initial matter, that plaintiffs may pursue a claim for relief under the Supremacy Clause based on the allegation that AB 1183 is preempted by § 30(A). Here, plaintiffs' Supremacy Clause claim is predicated upon federal conflict preemption. Under general principles of federal preemption, state law is preempted only to the extent that it actually conflicts with federal law. *Pacific Gas & Elec. Co. v. State Energy Comm'n*, 461 U.S. 190, 204, 103 S.Ct. 1713, 75 L.Ed.2d 752 (1983). Such a conflict may arise either where "compliance with both federal and state regulations is a physical impossibility, or where state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Id.* at 203–04, 103 S.Ct. 1713 (citations omitted).

Thus, to prevail on the merits plaintiffs will have to prove either that it is not possible for the Department to comply with both AB 1183 and the Medicaid Act or that AB 1183 stands as an obstacle to the enforcement of § 30(A). As such, the Court turns to the statutory provisions at issue here.

The "quality of care" provision of § (30)(A) provides that:

[a] State plan for medical assistance must ... provide such methods and procedures relating to the utilization of, and the payment for, care and services available under the plan ... as may be necessary to safeguard against unnecessary utilization of such care and services and to assure that payments are consistent with efficiency, economy, and quality of care.

42 U.S.C. § 1396a(30)(A). The "equal access" provision of § 30(A) provides that:

[a] State plan for medical assistance must ... provide such methods and procedures relating to the utilization of, and the payment for, care and services available under the plan ... as may be necessary to safeguard against unnecessary utilization of such care and services and to assure that payments are ... sufficient to enlist enough providers so that care and services are available under the plan at least to the extent that such care and services are available to the general population in the geographic area.

*Id.*

In *Orthopaedic Hospital v. Kizer*, 1992 WL 345652 (C.D.Cal.1992) ("*Orthopaedic I*"), plaintiff-hospital providers filed suit pursuant to 42 U.S.C. § 1983 ("§ 1983"), claiming that the Director violated § 30(A) by setting reimbursement rates for hospital outpatient services without considering the effect of hospital costs on efficiency, economy, and quality of care.[3] *Id.* at *1. The district court concluded that § 30(A) was enforceable in a § 1983 action, and that the Department "had a judicially enforceable obligation" to consider and make findings each time it modified reimbursement rates. *Id.* at *2. According to the district court, § 30(A) obligated the Department to consider efficiency, economy, and quality of care, which it referred to as the "relevant factors." *Id.* at *4. The district court found that the Director had acted arbitrarily and capriciously in establishing six of the seven challenged rates. *Id.* The court then remanded the matter to

---

**3.** The hospitals did not, however, challenge the rates under the "equal access" provision.

*Orthopaedic I*, 1992 WL 345652 at *14 n. 4.

the Department for further consideration. *Id.* at *14. Upon remand, the Department conducted a rate study, and readopted the reimbursement rates without change. *Orthopaedic Hospital II/III v. Belshe,* 103 F.3d 1491, 1495 (9th Cir.1997).

The hospitals returned to the district court, filing two lawsuits (*Orthopaedic II/III* ) that the district court consolidated, arguing that the adopted rates did not comply with § 30(A). *Id.* The district court entered judgment in favor of the Department, finding that the Department was not statutorily required to consider hospital costs when setting reimbursement rates. *Id.* The hospitals appealed, and the Ninth Circuit reversed. The Ninth Circuit's interpretation held that § 30(A) "provides that payments for services must be consistent with efficiency, economy, and quality of care, and that those *payments* must be sufficient to enlist enough providers to provide access to Medicaid recipients." *Id.* at 1496 (emphasis in original). The Ninth Circuit therefore concluded that under § 30(A)

> the Director must set hospital outpatient reimbursement rates that bear a reasonable relationship to efficient and economical hospitals' costs of providing quality services, unless the Department shows some justification for rates that substantially deviate from such costs.

To do this, the Department must rely on responsible cost studies, its own or others', that provide reliable data as a basis for its rate setting.

*Id.*[4] Further, the Ninth Circuit found that "[i]t is not justifiable for the Department to reimburse providers substantially less than their costs for purely budgetary reasons." *Id.* at 1499 n. 3.[5]

Whatever else its effect may have been, it is clear that *Sanchez v. Johnson,* 416 F.3d 1051 (9th Cir.2005) left undisturbed the rule announced in *Orthopaedic II/III* that § 30(A) creates duties on behalf of the Department, i.e., the duty to consider efficiency, economy, and quality of care when establishing reimbursement rates. Indeed, the *Sanchez* court recognized that "[§ 30(A) ] speaks ... of the *State's obligation* to develop 'methods and procedures' for providing services generally." *Sanchez,* 416 F.3d at 1059 (emphasis added).

Because *Orthopaedic II/III* is binding authority on this Court, the Court finds that when the State of California seeks to modify reimbursement rates for health care services provided under the Medi–Cal program, it must consider efficiency, economy, and quality of care, as well as the effect of providers' costs on those relevant statutory factors.

---

4. *See e.g., Alaska Dep't of Health & Soc. Servs. v. Ctrs. for Medicare & Medicaid Servs.,* 424 F.3d 931, 940–41 (9th Cir.2005); *see also Arkansas Med. Soc'y v. Reynolds,* 6 F.3d 519, 530 (8th Cir.1993) ("We agree with the trial court's conclusion that the relevant factors that DHS is obliged to consider in its ratemaking decisions are the factors outlined in 42 U.S.C. § 1396a(a)(30)(A)."); *cf. Methodist Hosps. v. Sullivan,* 91 F.3d 1026, 1030 (7th Cir.1996) (finding that § 30(A) does not require a state to consider any particular factors, but rather, requires that the state arrive at substantive results consistent with the Medicaid Act); *Rite Aid, Inc. v. Houstoun,* 171 F.3d 842 (3d Cir.1999) (same).

5. Subsequently, in *Sanchez v. Johnson,* 416 F.3d 1051 (9th Cir.2005), the Ninth Circuit held that § 30(A) does not confer individual rights that are enforceable under 42 U.S.C. § 1983. *Id.* at 1060. However, in *Independent Living,* 543 F.3d 1050 (9th Cir.2008), the Ninth Circuit held that "a plaintiff seeking injunctive relief under the Supremacy Clause on the basis of federal preemption need not assert a federally created 'right,' in the sense that term has been recently used in suits brought under § 1983, but need only satisfy traditional standing requirements." *Independent Living,* 543 F.3d 1050, 1058 (9th Cir. 2008).

In the instant motion for preliminary injunction, plaintiffs argue that AB 1183's five percent reimbursement rate reduction to ADHCs is preempted by § 30(A), because the Legislature did not consider any of the relevant factors as required by *Orthopaedic II/III*. Specifically, plaintiffs argue that the legislative history indicates that the bill was passed solely for budgetary reasons, arguing that "AB 1183's legislative history presents no evidence that the Legislature made any consideration of efficiency, economy, quality of care, and equality of access, as well as the effect of providers' costs on those relevant statutory factors in the 24–hour period between AB 1183's amendment and its passage." Mot. at 13.

Defendants, however, argue that the requirements of *Orthopaedic II/III* are in fact satisfied, because the Department itself performed a detailed analysis of the relevant factors. Specifically, defendant submits the Department's report "Analysis of Assembly Bill 1183 Medi–Cal Reimbursement for Adult Day Health Care Centers," ("Department ADHC Analysis"), completed in February 2009, well after the enactment of AB 1183 on September 16, 2008. Opp'n at 11. The Department ADHC Analysis concludes that:

> After a 5% payment reduction is implemented on March 1, 2009, Medi–Cal reimbursement paid to ADHCs will comply with title 42, United States Code, section 1396(a)(30)(A). The available data indicates that Medi–Cal recipients will continue to have sufficient access to ADHC services to the extent required by federal law. In fact they will actually have far better access to ADHC services than the general population does ... The 5% payment reduction will result in more efficient and economical Medi–Cal coverage. It will not have any negative impact for Medi–Cal recipients. The number of ADHCs participating in Medi–Cal has tripled since

1998 and 94% of all licensed ADHCs are actively enrolled in Medi–Cal. Finally, the Department determined that Medi–Cal reimbursement will in the aggregate compensate provider costs at a level that is well above the 'range of reasonableness' that was acceptable under the repealed Boren Amendment. Thus, reduced reimbursement will be sufficient under the more flexible requirements of section 1396(a)(30)(A).

Department ADHC Analysis at 10–11.

Plaintiffs, however, argue that the Department's post-hoc analysis does not satisfy the requirements of *Orthopaedic II/III*. The Court agrees. First, the Court notes that AB 1183, as passed by the Legislature, does not provide the Department with any discretion to determine whether the five percent rate reduction should be implemented based on the Department's consideration of the relevant factors. *See* Cal. Welf. & Inst.Code. § 14105.191 ("Notwithstanding any other provision of law, or order to implement changes in the level of funding for health care services, the *director shall reduce* provider payments, as specified in this section ...") (emphasis added). In *Orthopaedic II/III,* in which rates set by the Department, rather than the Legislature, were at issue, the court stated that the "the Department must rely on responsible cost studies, its own or others', that provide reliable data *as a basis* for its rate setting." 103 F.3d at 1496 (emphasis added); *see also id.* at 1499–1500 ("Since the Department did not adequately consider hospitals' costs *when readopting its rates,* the Department's actions were arbitrary and capricious and contrary to law") (emphasis added). The *Orthopaedic II/III* holding therefore indicates that the body responsible for rate setting must consider the relevant factors contemporaneously with the adoption of the rates. Because the Department has no authority to alter

the rate reduction imposed by the Legislature, the Department's post hoc analysis does not satisfy the requirements of *Orthopaedic II/III*.

Furthermore, in this case, it does not appear that the Legislature appropriately considered any of the relevant factors before passing AB 1183. Defendant responds to plaintiffs' arguments that the legislature did not perform the required analysis by submitting evidence indicating that (1) between May 2008 and September 2008, Department employees provided information to legislative staff members concerning the rate reductions; (2) in June 2008, the Subcommittee 3 Health Human Services, Labor, and Veterans Affairs Major Action Report included modifications and rejections of certain rate reductions proposed by the Administration; and (3) in July 2008, the Summary Overview Budget Conference Committee Report includes discussions of the rate reductions. *See* Trueworthy Decl. ¶ 5, Exs. A–E. However, none of this demonstrates that the Legislature relied on responsible cost studies providing reliable data in setting the rates. *See Orthopaedic Hospital II/III*, 103 F.3d at 1496. Furthermore, even if a post hoc analysis of the relevant factors was sufficient, the Court is not persuaded that the analysis actually conducted by the Department was adequate, given that the Department relied on NF–A data, which may not be an adequate proxy for ADHC costs. Reply at 12.

Therefore, because it appears that the Legislature and the Department did not properly consider the relevant factors prior to the passage of the five percent rate reduction in AB 1183, the Court finds that

plaintiffs have a strong likelihood of success on the merits.

## C. IRREPARABLE HARM

The next question before this Court is whether plaintiffs have shown that Medi–Cal beneficiaries will be irreparably harmed if the five percent rate reduction to ADHCs is permitted to go into effect. Defendant argues that plaintiffs cannot show irreparable harm resulting from the five percent rate reduction to ADHCs, given that the Department ADHC Analysis estimates that after AB 1183, ADHCs will be compensated at a level above 100 percent of necessary and reasonable ADHC costs.[6] Mot. at 16–17; Department ADHC Analysis at 8. Furthermore, with regard to access, defendants argue that, because Medicare and other health insurance plans do not cover ADHC services, ADHC services are not generally available to the general population, and therefore, "[p]laintiffs cannot meet their burden of proving that any payment reduction, let alone a 5% payment reduction, is going to affect access to services to which the general population has limited access in the first place." Mot. at 17; *see* Ferreria Decl. ¶ 3. In addition, defendant argues that, since 1998, an additional 212 ADHCs have enrolled in the Medi–Cal program, indicating that "for profit" ADHCs have found the reimbursement rate to be sufficiently profitable to join and remain in the Medi–Cal program. Mot. at 17; Department ADHC Analysis at 10. Finally, the Department's ADHC Analysis found that when the ten percent rate reduction was in effect between July 1, 2008 and August 17, 2008, there was only a two percent decrease in paid ADHC claims compared to a similar

---

6. The Department states that because it is in the process of auditing costs of ADHCs, it is not able to assess how current ADHC reimbursement in the aggregate compares to the reasonable and allowable costs that ADHCs incur. *See* Eng Decl. ¶ 4. Therefore, the Department's analysis uses as a proxy the costs of intermediate care facilities ("NF–As"). Plaintiff disputes the validity of this proxy, arguing that there is no basis for equating the costs of NF–As with the costs of ADHCs. Reply at 12.

period the prior year, indicating that a more moderate reduction will not result in a decrease in access. Mot. at 18; ADHC Analysis at 10.

Plaintiffs, however, submit declarations from ADHC providers which, they argue, indicate that ADHC provider costs currently exceed the reimbursement rate of $76.22 per patient participant ("participant") per day, and that the five percent rate reduction will serve to exacerbate this disparity. Mot. at 18; *see* Kauffman Decl. ¶ 6 (costs are $97.48 per participant per day); Vega Decl. ¶ 10 (costs are $95 per participant per day; five percent rate reduction will increase daily per participant deficit from $18.78 to $22.59); Regalia Decl. ¶ 7 (costs are $102 per participant per day). Plaintiffs further submit evidence that many ADHCs have closed in recent years due to financial pressures. Mot. at 18; Puckett Decl. ¶ 5 (closure of ADHC site in 2007 due to failure of Medi–Cal reimbursement to keep pace with costs); Vega Decl. ¶ 6 (Orange County ADHC closed in 2007 due to unmet costs by Medi–Cal). Plaintiffs argue that the declarations of ADHC providers indicate that many more ADHCs may be forced to close as a result of the AB 1183 rate reductions. Puckett Decl. ¶ 12 (five percent cut "threatens the very existence of our program"); Vega Decl. ¶ 11 (changes in Medi–Cal reimbursement places ADHC in jeopardy of closing.); Kauffman Decl. ¶¶ 8–10; Nolcox Decl. ¶ 9. Other ADHCs, plaintiffs argue, would be forced to take on fewer participants, meaning that some unserved Medi–Cal beneficiaries may be forced to enter a nursing home. Puckett Decl. ¶ 11 (as a result of AB 1183 reductions, ADHC cannot provide participants with transportation and will have to delay admissions); Kauffman Decl. ¶ 9 (reimbursement rate reductions will force ADHC to make additional cutbacks to ser-

vices and staff); Davis Decl. ¶¶ 5–7. Furthermore, plaintiff argues that the rate reduction will force ADHC participants to receive care in higher cost settings, such as emergency rooms and skilled nursing facilities, and that, due to shortages in skilled nursing facilities, some participants will be forced into institutions far from their families. Mot. at 20; Missaelides Decl. ¶¶ 20–21; Kauffman Decl. ¶¶ 10–11; Puckett Decl. ¶ 12; Pl's RJN Ex. 6 (Legislative Analyst's Office Analysis of 2008–09 Budget) at C–39 ("if rate reductions force Adult Day Health Care Centers to close, beneficiaries who rely on services provided by the centers to stay in their homes may be forced to enter into relatively more costly nursing homes or other assisted living facilities"). Plaintiffs also argue that plaintiffs Charles Gallagher and Fe Garcia, who both attend ADHC's, would be irreparably harmed if their ADHCs were to close. Mot at 22–23; Gallagher Decl. ¶¶ 7–8; Garcia Decl. ¶¶ 2, 4.

The Court finds that the evidence submitted by plaintiffs indicate that Medi–Cal beneficiaries are at risk of losing access to ADHC services due to the AB 1183 rate reduction. Furthermore, the Court is not convinced that the Department's data comparing the number of Medi–Cal claims under AB 5 to the previous year demonstrates that the rate reductions will not affect access, given that this data reflects claims immediately after the AB 5 rate reductions were implemented, when the full effect of the rate reduction might not yet have been felt by ADHCs. *See* Reply at 18. Therefore, the Court finds that plaintiffs have established sufficient irreparable harm so as to warrant an injunction.

### D. BALANCE OF HARDSHIPS

The Court is mindful of the difficulty facing the State of California in light of its fiscal crisis.[7] However, the State has ac-

---

7. Furthermore, if the five percent rate reduc-    tion is given effect, many Medi–Cal beneficia-

cepted federal funds under the Medicaid Act. In so doing, the State agreed to abide by the conditions imposed by Congress. Further, retroactive relief for Medi–Cal beneficiaries will likely be inadequate and, and it will come too late, to remedy their pain, suffering, and harm to their mental and physical well-being. *See e.g., Lopez v. Heckler*, 713 F.2d 1432, 1437 (9th Cir.1983). In light of the significant threat to the health of Medi–Cal recipients, reducing payments to healthcare service providers will likely cause, and given that nothing in this Court's order prevents respondent from imposing a rate reduction after she has appropriately considered and applied the relevant factors, the Court finds that the balance of hardships tips in favor of granting the preliminary injunction.

### E. PUBLIC INTEREST

 "The district court's public interest analysis should be whether there exists some critical public interest that would be injured by the grant of preliminary relief." *Hybritech v. Abbott Laboratories*, 849 F.2d 1446, 1458 (1988). Clearly, there is a public interest in ensuring that the State has enough money to meet its financial obligations in the face of competing demands. However, there is also a public interest in ensuring access to health care. In light of all the circumstances, including the fact that the State may decide to implement a rate change upon making a properly reasoned and supported analysis, the Court finds that the public interest does not weigh against the issuance of a preliminary injunction.

### IV. CONCLUSION

For the foregoing reasons, the Court GRANTS plaintiffs' motion for preliminary

ries may turn to more costly forms of medical care, such as emergency room care, thereby diminishing the State's projected savings.

injunction. The Court hereby orders respondent Director, his agents, servants, employees, attorneys, successors, and all those working in concert with him to refrain from enforcing Cal. Welf. & Inst. Code § 14105.191, as modified by AB 1183 beginning on March 9, 2009, by refraining from reducing by five percent payments to ADHCs provided under the Medi–Cal fee-for-service program.

IT IS SO ORDERED.

*See e.g., Rodde v. Bonta,* 357 F.3d 988, 999 (9th Cir.2004).