[No. A124098. First Dist., Div. Four. Aug. 20, 2010.]

CALIFORNIA HOSPITAL ASSOCIATION, Plaintiff and Appellant, v. DAVID MAXWELL-JOLLY, as Director, etc., et al., Defendants and Respondents.

COUNSEL

Hooper, Lundy & Bookman, Lloyd A. Bookman and Jordan B. Keville for Plaintiff and Appellant.

Edmund G. Brown, Jr., Attorney General, Douglas M. Press, Assistant Attorney General, and Susan M. Carson, Deputy Attorney General, for Defendants and Respondents.

OPINION

**REARDON, J.**—California Hospital Association (CHA), a trade association representing the interests of California hospitals, appeals from the denial of its petition for writ of mandate (Code Civ. Proc., § 1085), challenging the manner in which the State Department of Health Care Services (the Department) has been paying hospitals that operate distinct part nursing facilities (DP/NF's)[1] under California's Medicaid program, known as Medi-Cal. CHA claims the Department violated state and federal law, by imposing two separate limitations on the reimbursement rates for skilled nursing services rendered by DP/NF's to Medi-Cal beneficiaries. We reverse.

## I. BACKGROUND

A. *Statutory Framework*

1. *Federal Law*

 Medicaid is a cooperative federal-state program through which the federal government provides financial assistance to states so that they may furnish medical care to needy individuals. (42 U.S.C. § 1396; *Wilder v. Virginia Hospital Assn.* (1990) 496 U.S. 498, 502 [110 L.Ed.2d 455, 110 S.Ct. 2510]; *Mission Hospital Regional Medical Center v. Shewry* (2008) 168 Cal.App.4th 460, 469 [85 Cal.Rptr.3d 639] (*Mission Hospital*).) Although state participation is voluntary, if a state chooses to participate, it must prepare and submit a plan for approval to the federal government, describing its Medicaid program. (*Wilder v. Virginia Hospital Assn., supra,* at p. 502; *Mission Hospital, supra,* at p. 469; 42 C.F.R. § 430.10 (2009).) "The Centers for Medicare and Medicaid Services (CMS), formerly known as the Health

---

[1] "A 'distinct part nursing facility' operates as a distinct part of a hospital as opposed to a freestanding nursing facility[,] which is not part of a hospital." (*Palomar Pomerado Health System v. Belshe* (9th Cir. 1999) 180 F.3d 1104, 1106, fn. 3.)

Care Financing Administration, is the federal agency responsible for Medicaid." (*Mission Hospital, supra,* 168 Cal.App.4th at p. 470, fn. 1.)

Participating states are required to include in their plans reimbursement methods and standards for the medical services provided. (42 C.F.R. § 447.252(b) (2009); *Mission Hospital, supra,* 168 Cal.App.4th at p. 470.) The Medicaid Act provides detailed requirements for state plans. (See 42 U.S.C. § 1396a(a)(1)–(71).) The provision at issue in the instant appeal is subsection (a)(30)(A) of section 1396a of title 42 of the United States Code (section 30(A)), which "imposes both procedural and substantive requirements on states when they set reimbursement rates for hospital services provided to Medicaid beneficiaries. Designed to guarantee beneficiaries both high quality of care and equal access to care, section (30)(A) requires the state plan to provide 'such methods and procedures' relating to payment for services under the state plan as may be necessary 'to assure that payments are consistent with efficiency, economy, and quality of care and are sufficient to enlist enough providers so that care and services are available under the plan at least to the extent that such care and services are available to the general population in the geographic area . . . .' (§ (30)(A).)" (*Mission Hospital, supra,* at p. 473.)

Consequently, "any analysis of reimbursement rates on the statutory factors of efficiency, economy, quality, and access to care, must have the potential to influence the rate-setting process." (*California Pharmacists Assn. v. Maxwell-Jolly* (9th Cir. 2010) 596 F.3d 1098, 1109 (*California Pharmacists*), citing *Independent Living Center of Southern California v. Maxwell-Jolly* (9th Cir. 2009) 572 F.3d 644, 652, fn. 9 (*Independent Living*); see also *Orthopaedic Hospital v. Belshe* (9th Cir. 1997) 103 F.3d 1491, 1499 (*Orthopaedic Hospital*); *Mission Hospital, supra,* 168 Cal.App.4th at pp. 473–474.) Additionally, "[i]t is not justifiable . . . to reimburse providers substantially less than their costs for purely budgetary reasons. [Citations.]" (*Orthopaedic Hospital, supra,* 103 F.3d at p. 1499, fn. 3.)

2. *State Law*

"California participates in the federal Medicaid program through the Medi-Cal program. (Welf. & Inst. Code, § 14000 et seq.; Cal. Code Regs., tit. 22, § 50000 et seq.)" (*Mission Hospital, supra,* 168 Cal.App.4th at p. 474.) The Department (defendant herein) is the state agency charged with administering Medi-Cal in accordance with the state plan. (Cal. Code Regs., tit. 22, § 50004, subd. (b)(1).) At the time the instant litigation was commenced, Sandra Shewry was the Department's director.

■ The Department reimburses California DP/NF's for services rendered to Medi-Cal patients based on prospectively determined per diem rates, consisting of the lesser of the facility's projected costs or a prospectively determined median rate per day. (Cal. Code Regs., tit. 22, § 51511, subd. (a)(2).)

## B. *Facts and Procedural History*

In September 1995, the Department submitted a state plan amendment, "SPA 95-017," to CMS (Centers for Medicare and Medicaid Services), which set forth a revised reimbursement methodology. The plan amendment intended to reduce the DP/NF's reimbursement rate in the 1995–1996 rate year by changing the methodology to exclude, from the median calculation, those participating providers whose Medi-Cal patient days accounted for less than 20 percent of their total patient days (exclusion methodology or 20 percent exclusion). Although CMS notified the Department that it would not approve the amendment, according to the mandamus petition, the Department issued an emergency regulation the following month, which, in effect, incorporated the unapproved methodology for calculating the median rate for DP/NF's into the regulation.

On April 23, 1996, CHA filed the first of three actions challenging the new regulation and the exclusion methodology based on the Department's failure to comply with state and federal law. (*California Hospital Assn. v. Belshe* (Super. Ct. S.F. City and County, 1999, No. 977772) (*CHA I*).) On June 16, 1999, the San Francisco Superior Court agreed with CHA, ruling that the exclusion methodology, utilized by the Department for calculating the reimbursement rates for 1995–1996, violated the then existing Boren Amendment (42 U.S.C. former § 1396a(a)(13)(A)), which required state plans to provide for payment of services through the use of rates that were " 'reasonable and adequate to meet the costs which must be incurred by efficiently and economically operated facilities . . . .' " The trial court issued a writ of mandate and judgment in favor of CHA.

As a result of the Department's subsequent state plan amendment, "SPA 96-011," which similarly attempted to apply the 20 percent exclusion methodology for calculating DP/NF reimbursement rates for 1996–1997, CHA filed its second action. (*California Healthcare Assn. v. Bontá* (Super. Ct. S.F. City and County, 2002, No. 312880) (*CHA II*).) Following a brief trial, the trial court concluded that the Department was collaterally estopped under *CHA I* from defending the validity of the methodology used in the 1996–1997 rate year. On July 9, 2002, the trial court entered judgment for CHA and issued a writ of mandate against the Department.

Then, on March 11, 2003, the Legislature enacted Assembly Bill No. 1762 (2003–2004 Reg. Sess.), adding section 14105.06 to the Welfare and Institutions Code, which provides that, notwithstanding any other provisions of law, "the Medi-Cal reimbursement rates in effect on August 1, 2003, shall remain in effect through July 31, 2005 . . ." (rate freeze methodology) for, among other facilities, DP/NF's. The Department thereafter submitted another state plan amendment, "SPA 03-027," to CMS to incorporate the freeze into the state plan. CMS subsequently approved the rate freeze.

In November 2003, CHA filed the current and third action. On June 7, 2006, CHA filed an amended petition for writ of mandate (the petition), challenging the utilization of the 20 percent exclusion methodology for the rate years following the last state court judgment, from 2001 through 2006. CHA alleges that, despite the fact that the trial court has twice found the 20 percent exclusion methodology to be unsupported, arbitrary and capricious, the Department has continued to use the same inapt methodology, which has dubiously remained part of California Code of Regulations, title 22, section 51511. CHA further alleges that for the 2004–2005 rate year, the Department also arbitrarily imposed a freeze on DP/NF reimbursement rates. CHA argues that the rate freeze was imposed for purely budgetary reasons without consideration of the costs hospitals incurred in providing DP/NF services to Medi-Cal beneficiaries. According to the petition, "[p]rior to enacting the relevant statute and amending the state plan, no studies or analyses were conducted by the Legislature or [the Department] to determine whether the DP/NF rates resulting from the reimbursement freeze would be consistent with efficiency, economy[,] and quality of care[,] or with the cost[s] of providing the services impacted by the rate reduction."

Denying the petition for a writ of mandate, the trial court ruled on November 14, 2008, that CHA failed to establish a beneficial interest in seeking writ relief, and that section 30(A) did not impose any ministerial duties on the Department. The court found in favor of the Department and the instant appeal followed.

## II. DISCUSSION

A. *Standard of Review*

This appeal involves the denial of a traditional writ of mandamus under Code of Civil Procedure section 1085. "In traditional mandamus actions, the agency's action must be upheld upon review unless it constitutes an abuse of discretion. [Citation.] 'When reviewing the exercise of discretion, "[t]he scope of review is limited, out of deference to the agency's authority and presumed expertise: 'The court may not reweigh the evidence or substitute its

judgment for that of the agency. [Citation.]' " [Citation.] "In general . . . the inquiry is limited to whether the decision was arbitrary, capricious, or entirely lacking in evidentiary support . . . ." [Citation.] When making that inquiry, the " ' "court must ensure that an agency has adequately considered all relevant factors, and has demonstrated a rational connection between those factors, the choice made, and the purposes of the enabling statute." [Citation.]' " [Citation.]' [Citation.]" (*O.W.L. Foundation v. City of Rohnert Park* (2008) 168 Cal.App.4th 568, 585–586 [86 Cal.Rptr.3d 1].)

Moreover, " '[b]ecause "trial and appellate courts perform the same function in mandamus actions, an appellate court reviews the agency's action de novo." [Citation.]' [Citation.]" (*O.W.L. Foundation v. City of Rohnert Park, supra*, 168 Cal.App.4th at p. 586.)

## B. *Standing*

■ "There are two essential requirements to the issuance of a traditional writ of mandate: (1) a clear, present and usually ministerial duty on the part of the respondent, and (2) a clear, present and beneficial right on the part of the petitioner to the performance of that duty. [Citation.]" (*California Assn. for Health Services at Home v. State Dept. of Health Services* (2007) 148 Cal.App.4th 696, 704 [56 Cal.Rptr.3d 102] (*California Assn.*).)

"In this section, we discuss the second prong of the test for eligibility to seek mandate, [CHA's] interest in the Department's performance of [that] duty. The first prong, the existence of a duty, goes to the merits of . . . [CHA's] arguments, which we discuss in subsequent sections." (*Mission Hospital, supra*, 168 Cal.App.4th at p. 478.)

The Department urges us to affirm the judgment, asserting that CHA has no beneficial interest in enforcing federal law because there is no ministerial duty under section 30(A) to act in the manner suggested by CHA. Citing *Sanchez v. Johnson* (9th Cir. 2005) 416 F.3d 1051 (*Sanchez*), the Department argues that section 30(A) does not create a right enforceable by CHA. In *Sanchez*, the Ninth Circuit addressed the "narrow question" (*Independent Living, supra*, 572 F.3d at p. 653) of "whether developmentally disabled recipients of Medicaid funds and their service providers have a private right of action against state officials to compel the enforcement of a federal law governing state disbursement of such funds." (*Sanchez, supra*, 416 F.3d at p. 1053.) There, the court held that section 30(A) does not create any federal "right" enforceable under section 1983 of title 42 of the United States Code. (*Sanchez*, at p. 1068.)

■ To the extent the Department seeks to equate standing in the instant case with that required to seek relief under section 1983 of title 42 of the

United States Code, it misstates California law. (*Mission Hospital, supra,* 168 Cal.App.4th at p. 479.) "In California, a party who may not have standing to enforce the Medicaid Act under section 1983 of title 42 of the United States Code may still be entitled to enforce the act by means of a writ of mandate under Code of Civil Procedure section 1085 if he is a beneficially interested party under Code of Civil Procedure section 1086. [Citations.] 'While section 1983 of 42 United States Code requires violation of a private right, privilege, or immunity to confer standing, section 1085 of the California Code of Civil Procedure creates a broad right to issuance of a writ of mandate "to compel performance of an act which the law specifically enjoins." Section 1085 "is available not only to those who have enforceable private rights, but to those who are 'beneficially interested' parties within the meaning of Code of Civil Procedure section 1086." [Citation.]' [Citation.]" (*Mission Hospital, supra,* 168 Cal.App.4th at p. 479.)

■ A beneficially interested party is one who has a "special interest over and above the interest of the public at large." (*California Assn., supra,* 148 Cal.App.4th at p. 706.) "The beneficial interest standard is so broad, even citizen or taxpayer standing may be sufficient to obtain relief in mandamus. '[W]here a public right is involved, and the object of the writ of mandate is to procure enforcement of a public duty,' a citizen is beneficially interested within the meaning of Code of Civil Procedure section 1086 if 'he is interested in having the public duty enforced.' [Citation.]" (*Mission Hospital, supra,* 168 Cal.App.4th at p. 480.)

CHA is a beneficially interested party. It has an interest in challenging the amendments to the state plan and enforcing the Medicaid Act that is above the interest held by the public at large. CHA seeks the enforcement of public duties imposed on the Legislature and the Department by the Medicaid laws. Namely, CHA is interested in having its members compensated for the medical services they provide in accordance with the laws and rules established by Congress for the Medicaid program. These interests are sufficient to satisfy the beneficial interest prerequisite for obtaining writ relief.

We conclude CHA has standing to enforce the Department's duties under state and federal law to the extent such duties are clearly and presently compelled by such laws. (*California Assn., supra,* 148 Cal.App.4th at p. 707.)

We now turn to examine the duties CHA seeks to enforce.

C. *Mandamus Lies to Enforce Section 30(A)*

■ The primary question presented is whether section 30(A) imposes certain duties on behalf of the Department when establishing reimbursements

rates. "Mandamus will lie to compel a public official to perform an official act required by law. (Code Civ. Proc., § 1085.) Mandamus will not lie to control an exercise of discretion, i.e., to compel an official to exercise discretion in a particular manner. Mandamus may issue, however, to compel an official both to exercise his discretion (if he is required by law to do so) and to exercise it under a proper interpretation of the applicable law. [Citations.]" (*Common Cause v. Board of Supervisors* (1989) 49 Cal.3d 432, 442 [261 Cal.Rptr. 574, 777 P.2d 610].)

The Department argues that CHA seeks to constrain its discretion by compelling the use of a different methodology to establish reimbursement rates to DP/NF's. The Department insists there is no clear, present, and ministerial duty set forth in section 30(A). Although the Department acknowledges that section 30(A) establishes that a state plan must set forth " 'methods and procedures' " for setting reimbursement rates, it contends this provision is "infused with discretion." Pursuant to this discretion, the Department contends there is nothing in section 30(A) or its enabling regulations that requires a state to consider provider costs in any particular fashion when establishing its " 'methods and procedures,' " or that it conduct a study or analysis regarding the rate-setting formula set forth in the state plan.

The Department, citing *Sanchez, supra,* 416 F.3d 1051, argues that section 30(A) is "ill-suited to judicial remedy[ since] [t]he interpretation and balancing of the statute's indeterminate and competing goals would involve making policy decisions for which this court has little expertise and even less authority." (*Sanchez,* at p. 1060.) According to the Department, the "duty" CHA seeks to enforce is not "unmixed with discretionary power or the exercise of judgment" (*Unnamed Physician v. Board of Trustees* (2001) 93 Cal.App.4th 607, 618 [113 Cal.Rptr.2d 309]), because "it requires [the Department] to exercise [its] discretion by balancing the competing interests."

■ The fact that an agency's decision is subject to its broad discretion does not mean mandate is unavailable to aggrieved parties as a matter of law. "Although administrative actions enjoy a presumption of regularity, this presumption does not immunize agency action from effective judicial review." (*California Hotel & Motel Assn. v. Industrial Welfare Com.* (1979) 25 Cal.3d 200, 212 [157 Cal.Rptr. 840, 599 P.2d 31], fns. omitted.) It is well settled that mandamus will lie to correct an abuse of discretion by a public official or agency. (*Santa Clara County Counsel Attys. Assn. v. Woodside* (1994) 7 Cal.4th 525, 540 [28 Cal.Rptr.2d 617, 869 P.2d 1142]; *Common Cause v. Board of Supervisors, supra,* 49 Cal.3d at p. 442.) "Although traditional mandamus will not lie to control the discretion of a public official or agency, that is, to force the exercise of discretion in a particular manner, ' ". . . [it] will lie to correct abuses of discretion, and will lie to force a

particular action by the . . . officer, when the law clearly establishes the petitioner's right to such action." ' " (*Miller Family Home, Inc. v. Department of Social Services* (1997) 57 Cal.App.4th 488, 491 [67 Cal.Rptr.2d 171].)

Contrary to the Department's assertion, CHA does not seek to "control" its discretion in making ratemaking decisions. Rather, CHA seeks to correct an abuse of discretion resulting from the Department's failure to consider adequately the competing goals established under section 30(A). Namely, CHA asserts that the Department, in implementing the 20 percent exclusion and rate freeze methodologies, failed to balance efficiency, economy, and quality of care, as well as the effect of the providers' costs on these statutory factors.

We now address whether the Department, in implementing the challenged methodologies, complied with the statutory factors set forth in section 30(A).

D. *Exclusion Methodology*

1. *Collateral Estoppel*

Before addressing the merits of CHA's claim that the Department's 20 percent exclusion methodology violated state and federal law, we address its argument that the Department should be collaterally estopped from defending the validity of this methodology, in light of the trial court decision in *CHA I*, which found this method to be arbitrary and capricious.

█ "Collateral estoppel, one of two aspects of the res judicata doctrine, precludes the relitigation of an identical issue necessarily decided in previous litigation. [Citation.]" (*Huber v. Jackson* (2009) 175 Cal.App.4th 663, 677 [96 Cal.Rptr.3d 346].) "Courts traditionally have applied the doctrine of collateral estoppel only if several threshold requirements are fulfilled." (*Chacon v. Litke* (2010) 181 Cal.App.4th 1234, 1250 [105 Cal.Rptr.3d 214].) Specifically, collateral estoppel precludes relitigation of an issue where (1) the same issue was actually and necessarily decided in a prior case; (2) the prior action resulted in a final judgment on the merits; and (3) the party to be estopped was a party to the prior action, or in privity with a party. (*Lucido v. Superior Court* (1990) 51 Cal.3d 335, 341, 343 [272 Cal.Rptr. 767, 795 P.2d 1223].) The claim that the prior litigation establishes the invalidity of the 20 percent exclusion methodology founders upon the first of these requisites.

The dispositive issue here—i.e., whether the methodology used by the Department in setting reimbursement rates, whereby it excluded from its median cost study those facilities with less than 20 percent Medi-Cal days, complies with the statutory mandates of section 30(A), is not the same issue

adjudicated in *CHA I*. It appears that the same methodology, seemingly based on the same rationale and factual findings, was used by the Department in connection with the 2001–2002, 2002–2003, 2003–2004, 2004–2005, and 2005–2006 rate years. Nevertheless, in the prior action, the issue was whether the 20 percent methodology complied with former subsection (a)(13)(A) of section 1396a of title 42 of the United States Code (section 13(A)), which was known as the Boren Amendment. (*Mission Hospital, supra*, 168 Cal.App.4th at p. 471.) The Boren Amendment "imposed a substantive requirement on the states' establishment of reimbursement rates. [It] required the state plan to provide for payment for services through the use of rates that were 'reasonable and adequate to meet the costs which must be incurred by efficiently and economically operated facilities . . . .' (Former § 13(A) (1985).) States were required to provide . . . assurances that their rates satisfied this substantive requirement."[2] (*Mission Hospital, supra*, at pp. 470–471.) The Boren Amendment requirements were not (and are not) part of section 30(A). (*Orthopaedic Hospital, supra*, 103 F.3d at pp. 1498–1499 [dismissing Department's argument that requiring compliance with § 30(A) would render Boren Amendment superfluous].)

 "It is . . . well established that when the proceeding in which issue preclusion is currently sought involves different substantive law than the previous proceeding, collateral estoppel does not apply." (*United States Golf Assn. v. Arroyo Software Corp.* (1999) 69 Cal.App.4th 607, 617–618 [81 Cal.Rptr.2d 708].) For example, in *United States Golf Assn. v. Arroyo Software Corp.*, this court declined to give collateral estoppel effect to prior findings by a federal court relating to claims of misappropriation of service marks, because the prior action took place in a different legal context. (*Id.* at pp. 617–619.) There, the defendant sought to shield itself from the misappropriation claims, by arguing that the plaintiff's action was barred by an earlier Third Circuit decision. (*Id.* at pp. 610–611.) After noting the difference between California and New Jersey law on the issue of direct competition, we held the plaintiff's claims were not precluded because "the issues decided under New Jersey law in [the federal case] were not identical to those arising under California law . . . ." (*Id.* at pp. 618–619, fn. omitted.)

 CHA, focusing on the identity of past and present methodologies, contends that the repeal of the Boren Amendment is of no moment. This argument misses the mark. The law defines the issue in the first action; thus, when the current claim of issue preclusion involves different substantive law the second action does not present the same issue as the first. (See *United*

___

[2] "The Boren Amendment's substantive standards . . . generated significant amounts of litigation, resulting in higher Medicaid costs"; thus, "[i]n 1997, Congress repealed the Boren Amendment. (Pub.L. No. 105-33, § 4711(a)(1) (Aug. 5, 1997) 111 Stat. 251, 507.)" (*Mission Hospital, supra*, 168 Cal.App.4th at pp. 471–472.)

*States Golf Assn. v. Arroyo Software Corp., supra,* 69 Cal.App.4th at pp. 617–618; see also *Huber v. Jackson, supra,* 175 Cal.App.4th at pp. 677–678 [declining to collaterally estop party in second action where after first action new property statute enacted and new precedent on subject]; *Powers v. Floersheim* (1967) 256 Cal.App.2d 223, 229–230 [63 Cal.Rptr. 913] [holding no collateral estoppel based on prior action where collection agency statute under which defendants' were prosecuted was changed]; *Pacific Tel. & Tel. Co. v. City & County of San Francisco* (1961) 197 Cal.App.2d 133, 157–158 [17 Cal.Rptr. 687] [refusing to bar subsequent action where change in law shifted telephone service from municipal concern to statewide concern]; *Multi Denominational Ministry v. Gonzales* (N.D.Cal. 2007) 474 F.Supp.2d 1133, 1143 [holding no preclusive force where U.S. Supreme Court decision "shifted the legal terrain surrounding plaintiffs' suit"].)

Here, although the trial court did not expressly rule on CHA's collateral estoppel claim, we nevertheless uphold the court's implied finding that the issues decided under the Boren Amendment in *CHA I* were not identical to those arising under section 30(A) in the instant case.

We now turn to the merits of CHA's claim that the Department violated section 30(A).

### 2. *Analysis*

Relying on the standards set forth in *Orthopaedic Hospital, supra,* 103 F.3d 1491, CHA argues that the Department violated section 30(A) when it implemented the 20 percent exclusion methodology. In support of this assertion, CHA notes that the Department failed to provide any evidence that it studied the impact of the 20 percent exclusion on the statutory factors of efficiency, economy, quality, and access to care prior to implementing these rate reductions, nor did it demonstrate that it considered reliable cost studies when adjusting the reimbursement rates.

The Department does not dispute these omissions. Indeed, in response to CHA's discovery demands, the Department candidly admits that no such studies were performed. (See, e.g., Department's supplemental response to CHA's first set of requests for inspection and copying of documents, Apr. 16, 2007.) Rather, it argues nothing in section 30(A) or *Orthopaedic Hospital* imposed a clear, present and ministerial duty on the Department to consider some form of cost study or otherwise act in the manner suggested by CHA.[3] We disagree.

---

[3] We do not understand the Department as questioning the continued validity of *Orthopaedic Hospital* in light of the repeal of the Boren Amendment. Nevertheless, to the extent the Department suggests that *Orthopaedic Hospital* has been somehow undermined by the repeal of the Boren Amendment, we are not persuaded. (See *Independent Living, supra,* 572 F.3d at

Preliminarily, we note that, while decisions of the United States Supreme Court are binding on state courts on federal questions, " '. . . the decisions of the lower federal courts, while persuasive, are not binding on us. [Citation.] Thus, in the absence of a controlling United States Supreme Court opinion, we make an independent determination of federal law. . . .' " (*Forsyth v. Jones* (1997) 57 Cal.App.4th 776, 782–783 [67 Cal.Rptr.2d 357].)

The fact that neither section 30(A) nor *Orthopaedic Hospital* specifies "what kind of a study would or would not be appropriate," does not, as the statement of decision suggests, render them "devoid" of guidance in determining whether the Department had a clear, present and ministerial duty to consider the impact of the statutory factors prior to imposing the challenged rate reduction. The Ninth Circuit has issued multiple decisions instructing the Department on the procedural requirements of section 30(A).[4]

In *Orthopaedic Hospital, supra*, 103 F.3d 1491, several hospitals and health care associations alleged that the Department violated section 30(A) by setting provider reimbursement rates "without proper consideration of the effect of hospital costs on the relevant statutory factors [of] efficiency, economy, quality of care, and access." (103 F.3d at p. 1492.) There, the court interpreted section 30(A) to require the director to set reimbursement rates that "bear a reasonable relationship to efficient and economical hospitals' costs of providing quality services, unless the Department shows some justification for rates that substantially deviate from such costs." (103 F.3d at p. 1496.) To meet this statutory requirement, the court held that the director "must rely on responsible cost studies, its own or others', that provide reliable data as a basis for its rate setting." (*Ibid.*)

*Orthopaedic Hospital* discussed the purpose underlying section 30(A) at length, reading its text and legislative history as demonstrating that "Congress

---

pp. 654–655 [noting fact that Congress repealed the Boren Amendment "does not speak to the propriety of . . . [prior] interpretation of § 30(A)."]; *Alaska, Health & Social v. Medicare & Medicaid* (9th Cir. 2005) 424 F.3d 931, 940–941 [observing that repeal of Boren Amendment, "like its enactment, modified § 13(A) alone; it effected no change to § 30(A)."].)

[4] At oral argument, counsel for respondents asserted that *Orthopaedic Hospital* should not be followed in light of a "circuit split." Notably, counsel did not raise this argument in appellate briefing. We note there is a circuit split concerning whether section 30(A) mandates certain procedural requirements. (Compare *Orthopaedic Hospital, supra*, 103 F.3d at p. 1496 [§ 30(A) requires responsible cost studies] and *Arkansas Medical Society, Inc. v. Reynolds* (8th Cir. 1993) 6 F.3d 519, 531 [rate reduction cannot be enacted solely for budgetary reasons] with *Rite Aid of Pennsylvania, Inc. v. Houstoun* (3d Cir. 1999) 171 F.3d 842, 851–852 [§ 30(A) mandates only substantive compliance] and *Methodist Hospitals, Inc. v. Sullivan* (7th Cir. 1996) 91 F.3d 1026, 1030 [no particular methodology required].) This split, however, has no bearing on our conclusion. (See *Forsyth v. Jones, supra*, 57 Cal.App.4th at p. 782; see also *In re Marriage of Padgett* (2009) 172 Cal.App.4th 830, 839 [91 Cal.Rptr.3d 475].) Nevertheless, our independent interpretation of section 30(A) is in accord with the Ninth Circuit.

intended payments to be flexible within a range; payments should be no higher than what is required to provide efficient and economical care, but still high enough to provide for quality care and to ensure access to services." (*Orthopaedic Hospital, supra*, 103 F.3d at p. 1497.) The court held that the Department could not accomplish this purpose in the absence of some determination of "what it costs an efficient hospital economically to provide quality care." (*Id.* at p. 1498.) Thus, although the Department "need not follow a rigid formula of payments equal to an efficiently and economically operated hospital's costs regardless of other factors," section 30(A) required the Department to at least ascertain provider costs when it adjusted reimbursement rates. (103 F.3d at p. 1498.)

In *Independent Living, supra*, 572 F.3d 644, a group of health care advocates, pharmacies, and Medi-Cal providers and beneficiaries sought an injunction against the Department, seeking to restrain implementation of legislation imposing a 10 percent rate reduction in Medi-Cal payments on the grounds the legislation conflicted with the requirements of section 30(A). (*Independent Living*, at p. 649.) Relying on the standards established in *Orthopedic Hospital*, the court held that section 30(A) clearly applied to the state's decision to cut providers' reimbursement rates. (*Independent Living*, at pp. 648–649.) In so holding, the court reiterated that section 30(A) required the director to " 'rely on responsible cost studies, its own and others,' " that provide reliable data as a basis for its rate setting. (*Independent Living*, at pp. 648–649, quoting *Orthopaedic Hospital, supra*, 103 F.3d at p. 1496.) The court concluded this requirement was not met because "[t]he Director failed to provide any evidence that the Department or the [L]egislature studied the impact of the ten percent rate reduction on the statutory factors of efficiency, economy, quality, and access to care . . . , nor did [the Director] demonstrate that the Department considered reliable cost studies when adjusting its reimbursement rates." (*Independent Living, supra*, at p. 652.) The court determined that "[i]n the absence of such cost data, the Director could not have complied with § 30(A) . . . ." (*Ibid.*)[5]

Recently, in *California Pharmacists, supra*, 596 F.3d 1098, the Ninth Circuit upheld a preliminary injunction barring the Department from implementing legislation that reduced Medi-Cal reimbursement rates to providers of adult daycare. (*Id.* at pp. 1101–1102.) There, unlike in *Orthopaedic Hospital*, the Legislature mandated that the director reduce provider payments by a fixed percentage. (*California Pharmacists, supra*, 596 F.3d at pp. 1105–1106.) Rejecting the director's argument that the standards set forth

---

[5] The director also argued that the repeal of the Boren Amendment and the subsequent decision in *Sanchez, supra*, 416 F.3d 1051 called into question the continuing validity of *Orthopaedic Hospital*. (*Independent Living, supra*, 572 F.3d at pp. 653–655.) The court categorically rejected these contentions. (*Ibid.*)

in *Orthopaedic Hospital* did not apply to the rates set directly by the Legislature, the court held that "if the [L]egislature elects to by-pass the Department, and set rates itself, it must engage in the same principled analysis" required in *Orthopaedic Hospital.* (*California Pharmacists, supra,* 596 F.3d at p. 1106.) The Ninth Circuit confirmed that "[s]uch an approach is consistent with that of our sister circuits, where in the context of legislative, as opposed to agency, rate-setting, they too have focused on ensuring that the legislative body had information before it so that it could properly consider efficiency, economy, quality of care, and access to services *before* enacting rates. *See* [*Minnesota HomeCare Assn., Inc. v. Gomez* (8th Cir. 1997)] 108 F.3d 917, 918 (holding that although the agency did not provide any formal § 30(A) analysis to the [L]egislature, lobbyists 'actively participated in the . . . legislative session' such that the [L]egislature adequately considered § 30(A) when it raised reimbursement rates); cf. [*Arkansas Medical Society, Inc. v. Reynolds, supra,*] 6 F.3d 519, 530 (refusing to consider evidence offered during agency hearings regarding the effect of rate cuts on accessibility because it 'could only be confirmed by historical data accumulated after the cuts were made')." (*California Pharmacists, supra,* 596 F.3d at p. 1107, fn. omitted.)

The Ninth Circuit found "nothing remarkable in holding that the final body responsible for setting Medicaid reimbursement rates must study the impact of the contemplated rate reduction on the statutory factors of efficiency, economy, quality of care, and access to care *prior* to setting or adjusting payment rates." (*California Pharmacists, supra,* 596 F.3d at p. 1107.) The court "emphasize[d] that the State need not follow 'any prescribed method of analyzing and considering [the section 30(A)] factors.' [Citations.]" (*Ibid.*) Rather, " 'Congress intended payments to be flexible within a range; payments should be no higher than what is required to provide efficient and economical care, but still high enough to provide for quality care and to ensure access to services.' [Citation.] The only way to ensure that Congress's intent is realized is for the State to study the impact of the contemplated rate change on the statutory factors *prior* to setting rates." (*Ibid.*) The Ninth Circuit further explained that it "in no way . . . mean[t] to suggest that the State is proscribed from setting or adjusting reimbursement rates. We simply reaffirm that if it does so, it must comply with federal law." (*Ibid.*)

The Department points out—and we recognize—that *Orthopaedic Hospital, Independent Living,* and *California Pharmacists* are distinguishable from the instant case, in that none of these cases involved a writ of mandate. However, we find this distinction to be one without a difference. Whatever the form of remedy sought, the purpose in each case is to compel the Department to comply with the requirements set forth in section 30(A). Moreover, the injunctions at issue in *Independent Living* and *California Pharmacists* are not functionally different from the writ relief requested in the

instant action. Both forms of relief invoke notions of equity, and therefore the practical considerations addressed in the two cases apply here with equal force. (See 8 Witkin, Cal. Procedure (5th ed. 2008) Extraordinary Writs, § 24, pp. 904–905 [mandate]; 6 Witkin, Cal. Procedure, *supra*, Provisional Remedies, §§ 275, 276, pp. 218–219 [injunction].)

 Consistent with congressional intent, neither section 30(A) nor the cases interpreting this statute impose a "rigid formula" (*Orthopaedic Hospital, supra*, 103 F.3d at p. 1498) for the Department to follow. In this regard, we are not telling the Department anything new. To the extent the Department contends it is free to use any—or no—methodology to support its rate legislation, this argument reflects a misunderstanding of the law.

While the Department "need not follow a rigid formula" (*Orthopaedic Hospital, supra*, 103 F.3d at p. 1498) for determining what it costs DP/NF's to provide care to Medi-Cal recipients, it must rely on something other than purely budgetary reasons. (See *Independent Living, supra*, 572 F.3d at pp. 655–656 [holding state's decision to reduce Medi-Cal reimbursement rates for purely budgetary reasons violated federal law].) "[T]he Department must consider [providers'] costs based on reliable information when setting reimbursement rates . . . ." (*Orthopaedic Hospital, supra*, 103 F.3d at p. 1499.) We find nothing in the record that connects the decision to implement the exclusion methodology to any reliable information regarding the so-called inflated costs of DP/NF's with low Medi-Cal utilization percentages. At the very least, the Department could have determined whether these so-called "inflated costs" were due to some inefficiency in management or due to other variables such as the age and location of the facility, the number of higher acuity[6] patients, as well as any existing and/or planned facility renovations.

Dismissing such factors, the trial court focused on the fact that the Department relied on actual cost data of DP/NF's in adjusting the reimbursement rates and that the CMS ultimately approved the rates. The trial court also referred to an independent study, "the Dor study," on which the Department relied to support its position that "facilities that treat Medi-Cal patients have varying experiences," to wit: "[t]he more Medi-Cal patients treated, the lower the costs. Put another way, providers with less than 20 percent Medi-Cal patient days have higher costs." This evidence is inadequate for purposes of section 30(A). Nowhere does this evidence "study the

---

[6] Acuity is a medical term used to refer to a particular patient's required level of care based on the severity and/or complexity of an illness. (See *California Medical Assn. v. Regents of University of California* (2000) 79 Cal.App.4th 542, 545, fn. 2 [94 Cal.Rptr.2d 194].) Generally speaking, sicker or higher acuity patients require more care, and thus are more costly to treat. (See, e.g., *Children's Hospital & Medical Center v. Bonta'* (2002) 97 Cal.App.4th 740, 760 [118 Cal.Rptr.2d 629].)

impact of the contemplated rate change(s) on the statutory factors *prior to* setting rates, or in a manner that allows those studies to have a meaningful impact on rates before they are finalized," as required by *California Pharmacists, supra*, 596 F.3d at page 1115.

CMS's approval of the exclusion methodology does not compel a contrary conclusion. While CMS's approval of the state plan is required (*Mission Hospital, supra*, 168 Cal.App.4th at pp. 469–470 & fn. 1), nothing in the record suggests that CMS independently evaluated the adequacy of the proffered reimbursement rate. Moreover, although CMS approval is required to obtain federal assistance, such approval, in and of itself, cannot be deemed to exempt the Department from complying with section 30(A). To hold otherwise would render section 30(A) to be superfluous, which established rules of statutory construction expressly disfavor. (*Alianto Properties, Inc. v. City of Half Moon Bay* (2006) 142 Cal.App.4th 572, 591 [48 Cal.Rptr.3d 340] [noting fundamental rule of statutory construction that court will not adopt construction rendering provision ineffective or superfluous].)

 The Ninth Circuit has recently reiterated that "any analysis of reimbursement rates on the statutory factors of efficiency, economy, quality, and access to care, must have the potential to influence the rate-setting process. [Citations.]" (*California Pharmacists, supra*, 596 F.3d at p. 1109.) Thus, in order to comply with section 30(A)'s requirements, when the state seeks to modify reimbursement rates "it must: (1) 'rely on responsible cost studies, its own or others', that provide reliable data as a basis for its rate setting,' [citation]; *and* (2) study the impact of the contemplated rate change(s) on the statutory factors *prior* to setting rates, or in a manner that allows those studies to have a meaningful impact on rates before they are finalized." (*California Pharmacists, supra*, 596 F.3d at p. 1115.) Because the Department did neither with respect to the exclusionary methodology, we reverse the judgment denying CHA's petition for writ of mandate.

E. *Rate Freeze Methodology*

CHA contends the Department also violated section 30(A) when it enacted the rate freeze methodology without considering the statutory factors of efficiency, economy, quality, and access to care prior to implementing this methodology.

Although CHA challenged the rate freeze in its writ petition, the trial court's analysis appears to have been confined to the exclusion methodology. Indeed, while the trial court noted that CHA challenged "two separate payment limitations," it nevertheless addressed only the exclusion methodology.

Approximately five days after the trial court issued its statement of decision, the Third District Court of Appeal published *Mission Hospital, supra*, 168 Cal.App.4th 460, which addressed a similar rate freeze implemented by the Department. (*Id.* at pp. 476–477.) There, several hospitals filed a petition for writ of mandate challenging the freeze on reimbursement rates as being violative of section 13(A) and section 30(A). (*Mission Hospital, supra*, at p. 477.) After reviewing the requirements of the Boren Amendment (former § 13(A)), section 13(A) and section 30(A), the court held that the Department violated section 13(A) by failing to provide the requisite notice and comment rulemaking procedures when it enacted the challenged rate freeze. (*Mission Hospital, supra*, 168 Cal.App.4th at pp. 471–472, 492.) In light of this holding, the court determined it need not address the parties' remaining arguments, but noted in passing that its "reasoning on the application of section (13)(A) would also require the application of section (30)(A)" in implementing the rate freeze. (168 Cal.App.4th at p. 492.)

In the instant case, the parties dispute the precedential value of *Mission Hospital*. We agree with the Department that *Mission Hospital* is not dispositive of the CHA's claim that the Department violated section 30(A) when it implemented the rate freeze without considering the statutory factors of efficiency, economy, quality, and access to care prior to implementing this methodology.

In any event, the record supports the conclusion that the rate freeze was enacted solely for budgetary reasons. Assembly Bill No. 1762 (2003–2004 Reg. Sess.) was first introduced as a spot budget trailer bill in March 2003. The bill's subject was comprised of a single sentence with no substantive content, as it was intended only to start the clock running so that subsequent amendments could be added to implement the budget. According to the Senate floor analysis, the purpose of the rate freeze was to "curb the fiscal structural problem" facing the state for the 2004–2005 rate year. (See Sen. Rules Com., Off. of Sen. Floor Analyses, 3d reading analysis of Assem. Bill No. 1762 (2003–2004 Reg. Sess.) as amended July 27, 2003, p. 9.) Furthermore, in an enrolled bill report, prepared by the Department for the Legislature, the Department states that it supported the proposed rate freeze "as a cost containment strategy." (State Dept. of Health Services, Enrolled Bill Rep. on Assem. Bill No. 1762 (2003–2004 Reg. Sess.) as amended July 27, 2003, p. 7.) Thus, quite apart from any procedural requirements established by section 13(A) and *Mission Hospital*, the Department's decision to freeze Medi-Cal reimbursement rates based solely on state budgetary concerns violated federal law.[7] (*Orthopaedic Hospital, supra*, 103 F.3d at p. 1499, fn. 3; *Independent Living, supra*, 572 F.3d at pp. 655–656.)

---

[7] By reason of this holding, we need not address the propriety of CHA's reliance on section 13(A) as a basis for reversal, which was raised for the first time in CHA's new trial motion.

Moreover, as with the implementation of the 20 percent exclusion methodology, the Department violated section 30(A) and the requirements of *Orthopaedic Hospital, supra*, 103 F.3d 1491, when it implemented the rate freeze without first considering the impact on the statutory factors of efficiency, economy, quality, and access to care.

## F. *Extra-record Evidence*

Lastly, CHA argues that the trial court erred in considering evidence outside of the administrative record. Although CHA's briefs fail to articulate the challenged evidence, from our review of the record on appeal it appears that, at least in the trial court, CHA challenged the declaration of Sandra Yien, which set forth the Department's rationale for the exclusion methodology, to wit: "A major rationale for the 20 percent methodology was that the costs of DP/NFs that provided less than 20 percent of their total days of care to Medi-Cal beneficiaries did not represent the typical costs incurred for taking care of Medi-Cal beneficiaries. . . . Low-utilization Medi-Cal facilities tend to focus their business on treating private pay patients and Medicare patients."

▮ In determining whether extra-record evidence is admissible, a court must decide the threshold issue of whether the administrative action under review is quasi-legislative or ministerial. (*Western States Petroleum Assn. v. Superior Court* (1995) 9 Cal.4th 559, 575–576 [38 Cal.Rptr.2d 139, 888 P.2d 1268] (*Western States Petroleum*).) Our Supreme Court has stated: " 'The appropriate degree of judicial scrutiny in any particular case is perhaps not susceptible of precise formulation, but lies somewhere along a continuum with nonreviewability at one end and independent judgment at the other.' [Citation.] Quasi-legislative administrative decisions are properly placed at that point of the continuum at which judicial review is more deferential; ministerial and informal actions do not merit such deference, and therefore lie toward the opposite end of the continuum." (*Ibid.*)

▮ "An unbroken line of cases holds that, in traditional mandamus actions challenging quasi-legislative administrative decisions, evidence outside the administrative record (extra-record evidence) is not admissible. (*Western States Petroleum, supra*, 9 Cal.4th at p. 574 . . . .) However, the Supreme Court said in *Western States Petroleum* that since 'informal actions' are not entitled to judicial deference, 'we will continue to allow admission of extra-record evidence in traditional mandamus actions challenging ministerial or informal administrative actions if the facts are in dispute.' ([*Id.*] at p. 576.) The court was persuaded by commentators who pointed out that 'the administrative record developed during the quasi-legislative process is usually

adequate to allow the courts to review the decision without recourse to such evidence,' and that 'extra-record evidence is usually necessary only when the courts are asked to review ministerial or informal administrative actions, because there is often little or no administrative record in such cases.' (*Id.* at p. 575.)" (*Carrancho v. California Air Resources Board* (2003) 111 Cal.App.4th 1255, 1269 [4 Cal.Rptr.3d 536].)

██ Here, we are called upon to review amendments to the state plan, which unquestionably involved quasi-legislative action. (See *California Optometric Assn. v. Lackner* (1976) 60 Cal.App.3d 500, 505 [131 Cal.Rptr. 744] [quasi-legislative action where Director of Health adopted regulations establishing Medi-Cal rates]; see also *Wood v. Public Utilities Commission* (1971) 4 Cal.3d 288, 292 [93 Cal.Rptr. 455, 481 P.2d 823] [regulatory commission adoption of rules governing service and fixing rates quasi-legislative in nature]; *Building Code Action v. Energy Resources Conservation & Dev. Com.* (1980) 102 Cal.App.3d 577, 584 [162 Cal.Rptr. 734] [energy commission's adoption of regulations was quasi-legislative proceeding].) "The court in *Western States Petroleum* did not define the characteristics of an 'informal' agency action, but the commentators it cited (*Western States Petroleum, supra,* 9 Cal.4th at p. 575) indicate 'informal' actions are those that do not involve a hearing: 'When a CCP § 1085 ordinary mandamus proceeding is brought to challenge an administrative decision made without a hearing, if the facts are in dispute, a reviewing court is not limited to the record of the agency's proceedings. In the absence of a hearing, the record documenting the agency's action will not provide an adequate basis for judicial review. In such a case a reviewing court may hear extra-record evidence.' (2 Kostka & Zischke, Practice Under the Cal. Environmental Quality Act (Cont.Ed.Bar 2003) Judicial Review, § 23.52, pp. 969–970.)" (*Carrancho v. California Air Resources Board, supra,* 111 Cal.App.4th at p. 1269; see also *Friends of the Old Trees v. Department of Forestry & Fire Protection* (1997) 52 Cal.App.4th 1383, 1390–1391 [61 Cal.Rptr.2d 297].)

In the instant case, the challenged state plan amendments involved an administrative hearing, as well as a developed administrative record. Thus, the informal action exception does not apply here. In any event, having independently reviewed the entire record on appeal, we conclude that any error by the trial court in considering extra-record evidence was harmless. (*Cassim v. Allstate Ins. Co.* (2004) 33 Cal.4th 780, 800–802 [16 Cal.Rptr.3d 374, 94 P.3d 513].)

## III. DISPOSITION

The judgment is reversed and remanded to the trial court for proceedings consistent with this opinion.

Appellant is entitled to its costs on appeal.

Ruvolo, P. J., and Rivera, J., concurred.

A petition for a rehearing was denied August 20, 2010, and the opinion was modified to read as printed above. Respondents' petition for review by the Supreme Court was denied November 23, 2010, S186829.