[No. C064095. Third Dist. Mar. 26, 2012.]

CALIFORNIA ASSOCIATION FOR HEALTH SERVICES AT HOME et al., Plaintiffs and Respondents, v.
STATE DEPARTMENT OF HEALTH CARE SERVICES et al., Defendants and Appellants.

■■■■■■■■■■■■

■■■■■■■■■■■■

■■■■■■■■■■■■

## Counsel

Edmund G. Brown, Jr., and Kamala D. Harris, Attorneys General, Ismael A. Castro and Rebecca M. Armstrong, Deputy Attorneys General, for Defendants and Appellants.

Foley & Lardner, Robert C. Leventhal and Jeffrey R. Bates for Plaintiffs and Respondents.

## Opinion

**BLEASE, Acting P. J.**—In this appeal from a judgment granting a petition for a supplemental writ of mandate, we must decide whether the State Department of Health Care Services (the Department)[1] was required to consider provider costs or otherwise comply with the Ninth Circuit's decision in *Orthopaedic Hospital v. Belshe* (9th Cir. 1997) 103 F.3d 1491 (*Orthopaedic*) in conducting an annual review of Medi-Cal reimbursement rates paid to providers of home health agency services for the years 2001 through 2005.

The trial court found the Department had "not performed a proper rate review" and issued a writ of mandate commanding the Department to perform a further rate review consistent with *Orthopaedic*. The Department appeals, arguing (1) mandamus is not available because plaintiffs seek to control its discretion, (2) *Orthopaedic* is not controlling and the Department was not required to conduct the rate review in accordance with that decision, and (3) the Department's review otherwise satisfied the requirements prescribed in California's state plan.

---

[1] In July 2007, after the underlying action was initiated, the State Department of Health Services was renamed the State Department of Health Care Services. (Health & Saf. Code, § 20.)

We shall conclude that mandamus does lie where, as here, plaintiffs seek to correct what they perceive to be an abuse of discretion. We shall further conclude that the Department did not abuse its discretion in failing to consider provider costs or otherwise conduct its review in accordance with *Orthopaedic*, but that it nevertheless acted arbitrarily and capriciously by relying on out-of-date and irrelevant data in concluding that its rates were sufficient to ensure that Medi-Cal recipients had the same access to care in the geographical area as members of the general public from 2001 through 2005.

## FACTUAL AND PROCEDURAL BACKGROUND

"The Medicaid Act (42 U.S.C. §§ 1396a–1396v) authorizes federal grants to states for medical assistance to certain low income persons. [Citation.] The program is funded by both the federal and state governments, and administered by the states. [Citations.] To receive matching federal funding, states must agree to comply with the applicable Medicaid law. [Citation.] The state program in California is called Medi-Cal.

"Within broad federal rules, the states determine the payment levels for services, and make payment for services directly to the individuals or entities furnishing the services. [Citations.] The Medicaid Act requires each participating state to adopt a state plan describing the policy and methods to be used to set payment rates. [Citations.]" (*California Assn. for Health Services at Home v. State Dept. of Health Services* (2007) 148 Cal.App.4th 696, 700–701 [56 Cal.Rptr.3d 102] (*CAHSAH I*).)

Pursuant to 42 United States Code section 1396a(a)(30)(A) (hereafter referred to as section 30(A)), part of the Medicaid Act (Pub.L. No. 89-97, tit. I (July 30, 1965) 79 Stat. 343), each state plan must, "provide such methods and procedures relating to the utilization of, and the payment for, care and services available under the plan . . . as may be necessary to safeguard against unnecessary utilization of such care and services and to *assure that payments are consistent with efficiency, economy, and quality of care and are sufficient to enlist enough providers so that care and services are available under the plan at least to the extent that such care and services are available to the general population in the geographic area . . . .*" (Italics added.)

"DHS is the agency that administers California's state plan. [Citations.] California's state plan provides that the methodology for establishing payment rates is to develop an evidentiary base or rate study resulting in the determination of a proposed rate, to present the proposed rate at a public hearing to gather public input, to determine the payment rate based on both the evidentiary base and the public input, and to establish the payment rate

through the adoption of regulations." (*CAHSAH I, supra*, 148 Cal.App.4th at p. 701, fn. omitted.) With regard to home health agency services, the services at issue here, the state plan contained the following language as of the date this action was filed: " 'The State Agency shall perform an annual review of the Medi-Cal reimbursement rates paid to providers of home health agency services. The purpose of such review is to ensure that the rates comply with [section] (30)(A), which requires payments to be:

" '1) consistent with efficiency, economy, and quality of care; and

" '2) sufficient to enlist enough providers so that care and services are available at least to the extent that such care and services are available to the general population in the geographic area.' " (*Id.* at p. 702, fn. omitted.)[2]

Despite this plan provision, the Department had not performed a review of the applicable reimbursement rates since 2000 (*CAHSAH I, supra*, 148 Cal.App.4th at p. 702), and reimbursement rates for home health providers have remained unchanged since that time (Cal. Code Regs., tit. 22, § 51523, Hist.).

In 2005, plaintiffs filed a complaint and petition for mandamus relief (Code Civ. Proc., § 1085), alleging the Department violated state and federal law by refusing since 2000 to raise or review Medi-Cal reimbursement rates paid to providers of home health agency services (*CAHSAH I, supra*, 148 Cal.App.4th at pp. 700, 702). The trial court agreed in part and issued a writ of mandate requiring the Department to perform a review of reimbursement rates for the then current year (2005). (*Id.* at p. 700.) The court denied plaintiffs' request for a writ to compel the Department to raise reimbursement rates for prior years. (*Ibid.*) Both parties appealed. (*Ibid.*)

In *CAHSAH I*, we held that "DHS was required to review reimbursement rates annually, but that plaintiffs . . . failed to show DHS was obligated to set new rates." (*CAHSAH I, supra*, 148 Cal.App.4th at p. 700.) We further concluded that the trial court erred in not extending its mandate to prior years. (*Ibid.*) Accordingly, we directed the trial court to issue a writ of mandate compelling the Department to conduct an annual review of the Medi-Cal reimbursement rates paid to the providers of home health agency services for the years 2001 through 2005. (*Id.* at p. 710.) On April 24, 2008, the trial court issued a writ of mandate consistent with our decision.

The Department completed the rate review in March 2009 and concluded that the rates paid to providers of home health agency services for the years

---

[2] The state plan was amended effective December 31, 2005, to delete the annual review of rates requirement. (*CAHSAH I, supra*, 148 Cal.App.4th at p. 702, fn. 2.)

2001 through 2005 were consistent with efficiency, economy, and quality of care, and sufficient to enlist enough providers so that care and services are available at least to the extent such care and services are available to the general population in the geographic area as required under the state plan and section 30(A). The Department did not consider provider costs in any of its analyses or determine whether its rates were reasonably related thereto.

In February 2009, plaintiffs sought a supplemental writ of mandate, claiming the rate review was flawed. More particularly, plaintiffs asserted that "instead of performing a valid study, [the Department] . . . failed to consider . . . whether the rates are sufficiently high to cover an efficient, economical provider's costs" as required under *Orthopaedic* or "meaningfully address quality of care and access to services . . . ." Plaintiffs requested, among other things, that the trial court issue a supplemental writ of mandate requiring the Department to perform a proper rate review based on responsible cost studies for each of the years 2001 through 2005 and "address the following for each year in its rate review: (1) whether the rates were sufficiently high to cover the costs of an efficient and economically operated home health provider; (2) whether the rates were sufficiently high to be consistent with the provision of quality care; and (3) whether the rates were sufficiently high to ensure that Medi-Cal recipients had the same access to care in their geographical area as members of the general public."

The trial court determined that the Department had "not performed a proper rate review for the years 2001 through 2005" and issued a supplemental writ of mandate directing the Department to "perform a further rate review which is consistent with *Orthopaedic* . . . and the Court's September 25, 2009 Minute Order" and "address whether the rates were sufficient to address the costs of an efficient and economically operated home health [care] provider, whether the rates [were] sufficient to be consistent with the provision of quality care, and whether the rates [were] sufficient to ensure that Medi-Cal recipients have the same access to care in their geographical area as members of the general public."

## DISCUSSION

### I

### Mandamus Lies to Enforce the Initial Writ of Mandate

The Department first contends that mandate is unavailable where, as here, plaintiffs seek to control its discretion by commanding it to consider provider costs and determine whether its rates bore a reasonable relationship to such costs in performing its rate review. We disagree.

■ Mandamus will lie to compel a public official to perform an official act required by law. (Code Civ. Proc., § 1085.) While mandamus will not lie to control an exercise of discretion, i.e., to compel an official to exercise discretion in a particular manner, mandamus may issue to compel an official both to exercise his or her discretion (if he or she is required by law to do so) and to exercise it under a proper interpretation of the applicable law. (*California Hospital Assn v. Maxwell-Jolly* (2010) 188 Cal.App.4th 559, 569–570 [115 Cal.Rptr.3d 572] (*CHA*); see also *Common Cause v. Board of Supervisors* (1989) 49 Cal.3d 432, 442 [261 Cal.Rptr. 574, 777 P.2d 610].)

■ Although the Department has broad discretion in performing the required rate review, the fact that an agency's action is subject to its broad discretion does not mean mandate is unavailable to aggrieved parties as a matter of law. (*CHA, supra*, 188 Cal.App.4th at p. 570.) " 'Although administrative actions enjoy a presumption of regularity, this presumption does not immunize agency action from effective judicial review.' [Citation.] It is well settled that mandamus will lie to correct an abuse of discretion by a public official or agency. [Citations.]" (*Ibid.*)

Here, plaintiffs seek to correct what they perceive to be an abuse of discretion resulting from the Department's failure to consider provider costs or otherwise conduct its review in accordance with *Orthopaedic* or meaningfully analyze whether the rates were consistent with quality of care and sufficient to enlist enough providers. Accordingly, mandamus is available. (See *CHA, supra*, 188 Cal.App.4th at p. 571.) Whether the trial court erred in granting the supplemental writ of mandate and directing the Department to perform a further rate review is addressed below.

II

The Department Was Not Required to Consider Provider
Costs or Employ Any Particular Methodology in Performing
Its Rate Review

The Department next contends the trial court erred in directing it to perform a further rate review consistent with the Ninth Circuit's decision in *Orthopaedic*. We agree.

In *Orthopaedic*, the Ninth Circuit held that in order to appropriately apply section 30(A) in setting hospital outpatient reimbursement rates, the Department must set rates "that bear a reasonable relationship to efficient and economical hospitals' costs of providing quality services, unless the Department shows some justification for rates that substantially deviate from such costs. To do this, the Department must rely on responsible cost studies, its

own or others', that provide reliable data as a basis for its rate setting." (*Orthopaedic, supra,* 103 F.3d at p. 1496.) The court reasoned that the Department "cannot know that it is setting rates that are consistent with efficiency, economy, quality of care and access without considering the costs of providing such services." (*Ibid.*)

■ As the Department correctly notes, we are not bound by decisions of the lower federal courts on issues of federal law. (*CHA, supra,* 188 Cal.App.4th at p. 574.) While persuasive, such decisions are not binding. (*Ibid.*) In the absence of controlling authority from the United States Supreme Court, we make an independent determination of federal law. (*Ibid.*) Having done so, we conclude that section 30(A) does not require states to utilize any particular methodology in setting reimbursement rates. Nor, as relevant here, did section 30(A) require the Department to consider provider costs in performing its rate review, much less ensure that its rates bore a reasonable relationship to such costs.

■ We begin our analysis with the language of section 30(A), as incorporated into the state plan: "The State Agency shall perform an annual review of the Medi-Cal reimbursement rates paid to providers of home health agency services. The purpose of such review is to ensure that the rates comply with [section] (30)(A), which requires payments to be:

"1) consistent with efficiency, economy, and quality of care; and

"2) sufficient to enlist enough providers so that care and services are available at least to the extent that such care and services are available to the general population in the geographic area."

Nothing in the language of section 30(A) or any implementing regulation requires a state to utilize any particular methodology in setting, or, as relevant here, reviewing reimbursement rates. We agree with the Courts of Appeals for the Third and Seventh Circuits "that section 30(A) requires the state to achieve a certain result but does not impose any particular method or process for getting to that result." (*Rite Aid, Inc. v. Houstoun* (3d Cir. 1999) 171 F.3d 842, 851; see also *Methodist Hospitals, Inc. v. Sullivan* (7th Cir. 1996) 91 F.3d 1026, 1030.) Such an interpretation is consistent with our decision in *CAHSAH I* in which we observed that the operable state plan, which incorporated section 30(A), "describe[d] no methodology for performing the annual review . . . ." (*CAHSAH I, supra,* 148 Cal.App.4th at p. 708.)[3]

---

[3] We respectfully disagree with *CHA* to the extent it holds that section 30(A) imposes on states an obligation to consider provider costs anytime it sets reimbursement rates. (*California Hospital Assn. v. Maxwell-Jolly, supra,* 188 Cal.App.4th at p. 578.)

■ Moreover, when Congress intended for states to base Medicaid reimbursement rates on provider costs, it said so expressly. The Boren Amendment to the Medicaid Act, previously codified at 42 United States Code section 1396a(a)(13)(A), required states to make payments for hospital services, nursing facility services, and intermediate care facilities for the mentally retarded based on rates that "are reasonable and adequate to meet the costs which must be incurred by efficiently and economically operated facilities . . . ." (42 U.S.C. former § 1396a(a)(13)(A) (1996).) Section 30(A) says nothing about provider costs.[4] Congress' failure to mention costs in section 30(A) bolsters our conclusion that it did not intend to require states or agencies to consider provider costs in setting rates under that section. (See *Field v. Mans* (1995) 516 U.S. 59, 67 [133 L.Ed.2d 351, 360, 116 S.Ct. 437] ["an express statutory requirement here, contrasted with statutory silence there, shows an intent to confine the requirement to the specified instance"].)

■ Finally, we are not persuaded that the Department "cannot know that it is setting rates that are consistent with efficiency, economy, quality of care and access without considering the costs of providing such services." (*Orthopaedic, supra*, 103 F.3d at p. 1496.) While common sense suggests that consideration of the costs involved in providing a particular service would be of considerable value in setting reimbursement rates that comply with section 30(A), we are not prepared to say that consideration of provider costs is required in every instance. Nor have plaintiffs shown that the Department cannot know whether its rates for home health agency services during the relevant time period were consistent with efficiency, economy, quality of care and access without considering the costs of providing such services. As the United States Department of Health and Human Services noted in the commentary preceding recently proposed rules interpreting section 30(A), "[t]hough cost may be one consideration affecting access to care, there are other factors such as local market conditions, variable provider costs, administrative burden for providers, and demographic differences. Depending upon State circumstances, cost-based studies may not always be informative or necessary." (U.S. Dept. Health & Human Services, com., Medicaid Program; Methods for Assuring Access to Covered Medicaid Services, 76 Fed.Reg. 26342, 26344 (May 6, 2011).)[5] In sum, we find that consideration of provider costs is not mandated; within the Department's discretion, provider costs may be considered or not, so long as its

---

[4] The Boren Amendment was repealed in 1997. (See Balanced Budget Act of 1997, Pub.L. No. 105-33 (Aug. 5, 1997) § 4711, 111 Stat. 251, 507-508.)

[5] The proposed rules, 42 Code of Federal Regulations part 447.203 et seq. (2011), were published in the Federal Register on May 6, 2011, and the comment period ended July 5, 2011. (76 Fed.Reg. 26342 (May 6, 2011).)

process of decisionmaking is not arbitrary or capricious. (See *O.W.L. Foundation v. City of Rohnert Park* (2008) 168 Cal.App.4th 568, 585–586 [86 Cal.Rptr.3d 1].)[6]

## III

### The Department Acted Arbitrarily and Capriciously in Concluding Its Rates Complied with Section 30(A)

Finally, assuming we conclude, as we have, that the Department was not required to consider costs or otherwise conduct its rate review in accordance with *Orthopaedic*, the Department contends "there is no basis for finding that [it] acted in an arbitrary or capricious manner, or that the 2008 rate review violated the trial court's order" because it analyzed the section 30(A) factors "to the best extent information on how to define, measure, and quantify data was available." Plaintiffs dispute the Department's contention, arguing, among other things, that the Department acted arbitrarily and capriciously by failing to consider whether its rates were too low (as opposed to too high) and relying on "meaningless data." We agree with plaintiffs that the Department's conclusion that its reimbursement rates for home health agency services for the period 2001 through 2005 complied with section 30(A) was entirely lacking in evidentiary support and find that a further rate review is required.

In general, an agency's decision will be upheld unless the decision was arbitrary, capricious, or entirely lacking in evidentiary support. (*CHA, supra*, 188 Cal.App.4th at p. 568.) When reviewing an agency's decision, the court must ensure that an agency has adequately considered all relevant factors, and has demonstrated a rational connection between those factors, the choice made, and the purposes of the enabling statute. (*O.W.L. Foundation v. City of Rohnert Park, supra*, 168 Cal.App.4th at pp. 585–586.)

As a preliminary matter, we note that " '[b]ecause "trial and appellate courts perform the same function in mandamus actions" ' " (*O.W.L. Foundation v. City of Rohnert Park, supra*, 168 Cal.App.4th at p. 586), the trial court's failure to determine whether the Department meaningfully analyzed whether its rates were consistent with quality of care and sufficient to

---

[6] The Department's renewed request for judicial notice of the amicus curiae brief filed in the United States Supreme Court in *Douglas v. Independent Living Center of Southern Cal., Inc.* (2012) 565 U.S. ___ [182 L.Ed.2d 101, 132 S.Ct. 1204] is granted. (Evid. Code, §§ 452, subd. (d), 459; *Chase Bank USA, N.A. v. McCoy* (2011) 562 U.S. ___, [178 L.Ed.2d 716, 728, 131 S.Ct. 871]; *Guild Mortgage Co. v. Heller* (1987) 193 Cal.App.3d 1505, 1514, fn. 11 [239 Cal.Rptr. 59].)

enlist enough providers, issues that were briefed below, does not preclude us from considering those issues on appeal.

In performing its rate review, the Department interpreted the "efficiency" and "economy" language to mean "paying the *lowest rate* possible or practicable for the program service or benefit" and concluded the rates for home health agency services during the relevant time period "do not violate any upper limit imposed by 'efficiency' or 'economy' within the ambit of the EEQ [(efficiency, economy, and quality of care)] provision." The Department declined to interpret the "efficiency" and "economy" language "as imposing a recognized minimum rate payment . . . ." Plaintiffs complain that interpreting the language in such a manner "is inconsistent with the plain language of the statute and would lead to absurd results. If the language is merely an upper payment limit, then [the Department] could set the reimbursement rates at zero without violating the statutory language." We decline plaintiffs' invitation to dictate to the Department how it performs its rate review. As previously discussed, section 30(A) "requires the state to achieve a certain result but does not impose any particular method or process for getting *to* that result." (*Rite Aid, Inc. v. Houstoun, supra,* 171 F.3d at p. 851; see also *Methodist Hospitals Inc. v. Sullican, supra,* 91 F.3d at p. 1030.) In any event, if the Department can show that Medi-Cal beneficiaries received quality care and had access to home health agency services equal to that of the general public, one could reasonably assume that the rates paid for such services were not too low.

With respect to quality of care, the Department compared complaint data from the State Department of Public Health, Licensing and Certification Division and California's Board of Registered Nursing with the number of Medi-Cal visits for home health agency services for each of the relevant years and found that "complaints pertaining to Home Health Services for years 2001 through 2005 . . . are statistically insignificant" and on that basis concluded that the rates for those years "were consistent with the quality of care language set forth in the EEQ provision." Plaintiffs complain that the complaint data relied upon by the Department is "meaningless" and that the Department's "cursory analysis is on its face insufficient to determine whether quality of care is being provided." Plaintiffs question whether Medi-Cal recipients themselves are "sufficiently knowledgeable about home health services to know when the services they are receiving are substandard" or "would report their concerns to the two government agencies whose records [the Department] relied upon." They also assert that the Department should have looked at factors such as staff turnover rates and caregiver experience. While there are additional factors that bear upon the quality of care, we are mindful that the Department's access to certain types of data was limited by the fact that it was looking at a time period in the past. The Department did give some consideration to the quality of care received by

reviewing the complaint data. Given our deferential and narrow standard of review, we cannot find that the Department acted arbitrarily and capriciously in relying on such data or in concluding that the rates paid to providers of home health agency services during the years 2001 through 2005 were consistent with quality of care. The same, however, cannot be said with respect to the Department's review of access to services.

In concluding that "Medi-Cal Home Health Agency rates paid for years 2001 through 2005 were sufficient to enlist enough providers so that care and services were available at least to the extent that such care and services were available to the general population in the geographic area," the Department relied on a 1998 study which "indicated an expansion of Medi-Cal [home health agency] services" from 1992 to 1997; a 10 percent rate increase for home health services in 2000; an overall increase in the number of Medi-Cal home health care providers between 2001 and 2005; and a comparison of Medi-Cal reimbursement rates to those paid by Florida, Oregon, Texas, Arizona, and Illinois that indicated Medi-Cal rates were consistent with the rates paid by other states.

As plaintiffs point out, the access study relied on by the Department did not look at the relevant time period, 2001 through 2005; rather, it looked at data from 1992 through 1997. The Department responds that it used the study "as a baseline for projections forward in consideration of a ten percent [rate] increase in *2000.*" (Italics added.) The problem with the Department's claim is that the Department was directed to conduct an annual review of the Medi-Cal reimbursement rates paid to providers of home health care services for the years *2001 through 2005.* Even assuming that Medi-Cal recipients had equal access to home health agency services in 1997 and taking into account the 10 percent rate increase in 2000, it does not logically follow that Medi-Cal recipients had equal access from 2001 through 2005. Moreover, the Department's assertion is inconsistent with the requirement of an *annual* rate review. The Department cannot simply raise its rates and presume they will be sufficient to ensure equal access for the next five years. Furthermore, the access study warned that recent legislative and regulatory changes in the Medicare program could force Medi-Cal "providers that do not adapt their operations to the efficiencies required by the Medicare program" to close, and "[s]uch closures may impact access to home health services for all users, including Medi-Cal beneficiaries, in the State of California." Thus, there was more than a mere possibility that access to services would change in the years following the 1998 study.

Moreover, while the Department touts the fact that the average number of Medi-Cal home health agency service providers grew 7 percent during the relevant time period, plaintiffs correctly note that according to the Department's own data the average number of Medicare home health service

providers grew 26 percent during the same period, and the difference between the number of home health agencies that accept Medicare and the lower number that accept Medi-Cal more than doubled during the same time period. Plaintiffs persuasively argue that the growing discrepancy "would cause any reasonable person to question whether Medi-Cal beneficiaries have as much access to home health care services as the general population."

Finally, with respect to the rate comparison, plaintiffs accurately observe that the Department "did nothing to determine whether the [Medicaid] rates in the other states were adequate to provide equal access to services" or to account for "the higher salaries that California employers pay for nurses or the higher minimum wages, workers compensation costs, overhead and other expenses associated with doing business in California."

■ While the Department considered a number of factors, it utterly failed to demonstrate a rational connection between those factors and its conclusion that the Medi-Cal reimbursement rates paid to providers of home health agency services for years 2001 through 2005 were sufficient to enlist enough providers so that care and services were available at least to the extent that such care and services were available to the general public in the geographic area. Stated another way, no reasonable person could rely on this data to conclude, as the Department did here, that its rates were sufficient to provide the access to services required under section 30(A). Again, while we are aware that the Department's task of performing the annual rate review is complicated by the fact that the review concerned a period in the past and certain data may no longer be available, we observe that the types of data relied on in the access study concerning expenditures for home health agency services, the number of users as a percentage of eligibles, and the number of providers serving Medi-Cal beneficiaries are the type of data that presumably would be available for the relevant time period (2001 through 2005).

In sum, the Department failed to make a reasonable attempt to ensure that the reimbursement rates paid to providers of home health agency services for the years 2001 through 2005 were sufficient to enlist enough providers so that care and services were available at least to the extent that such care and services were available to the general public in the geographic area, and thus, the Department acted arbitrarily and capriciously in reaching its conclusion.

## DISPOSITION

The judgment is affirmed in part and reversed in part. The trial court is directed to issue a supplemental writ of mandate compelling the Department to conduct a further rate review of the Medi-Cal reimbursement rates paid to the providers of home health agency services for the years 2001 through 2005

in accordance with the state plan, section 30(A), the April 24, 2008, writ of mandate, and the provisions of this opinion. The parties shall bear their own costs on appeal. (Cal. Rules of Court, rule 8.278(a)(5).)

Nicholson, J., and Duarte, J., concurred.